# United States Court of Appeals
## For the First Circuit

No. 02-1732

H. CHARLES TAPALIAN,

Plaintiff-Appellee,

v.

JAMES V. TUSINO,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Selya, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

Patrick J. Costello, with whom James W. Simpson, Jr. and Merrick, Louison & Costello, LLP were on brief for appellant.

Lauren E. Jones, with whom Mark L. LaBollita, Jones Associates, John B. Reilly, and John Reilly & Associates were on brief for appellee.

July 23, 2004

**CYR**, **Senior Circuit Judge**.     James V. Tusino, the Superintendent of the Department of Public Works (DPW) for the Town of Seekonk, Massachusetts ("Town"), appeals from a district court judgment directing him to pay plaintiff-appellee H. Charles Tapalian compensatory and punitive damages for violating Tapalian's equal protection rights in connection with a road reconstruction project.    As we discern no error, we affirm the district court judgment.

**I**

**BACKGROUND**

1.    Our review of the record discloses that the jury rationally could have found the following facts: In 1989, the Town rejected Tapalian's application for a permit to construct a subdivision – to be known as "Pembroke Estates" – because Davis Street, the lone access road to the subdivision, was too narrow.  Tapalian brought suit against the Town in state court, and in 1994 the parties entered into an Agreement for Judgment ("Agreement") whereby Tapalian agreed as a precondition to the construction of Pembroke Estates that he would improve a portion of Davis Street at his own expense, by "scarifying" the existing road surface then resurfacing it with a double layer of oil-

-2-

sealed "stone chip" to a paved width of twenty-two feet. The Agreement further prescribed that Tapalian's specifications must be approved by the Town's DPW director.

In 1995, Tusino was appointed the new DPW superintendent for the Town. In 1997, Tusino, who was unaware of the 1994 Agreement, caused Davis Street to be widened and resurfaced with "stone chip" at the Town's expense. Early in 1998, after Tusino had learned of the Agreement, Tapalian and Tusino met for the first time, at Davis Street, to discuss other Davis Street improvements (if any) which Tapalian would be required to make before Tapalian could commence construction of Pembroke Estates. Tusino informed Tapalian that, as a condition of his approval of the specifications, Tapalian was to set him up with "two women" who worked at a nightclub located in a building owned by Tapalian. Tapalian advised Tusino that he was not about to act as his "pimp."

At their next meeting, Tusino sought to impose upon Tapalian other more onerous conditions not explicitly contemplated under the 1994 Agreement. Although Tusino had not consulted with any engineering expert, he informed Tapalian that he interpreted the term "scarification" – contained in the Agreement – to require that Tapalian undertake a costly pulverization of the existing stone-chip surface which the Town had just installed within the previous year. Whereas in road-construction parlance scarification

-3-

simply requires that grooves be etched into the old road surface to ensure adequate adhesion of the newly applied surfacing materials.

In addition, Tusino insisted that Tapalian straighten the curves in Davis Street, pave the entire street (as distinguished from the portion specified in the Agreement), and construct three-foot-deep, gravel-filled trenches on both sides of the resurfaced roadway, almost three times the depth prescribed by the "industry standard." Further, Tusino informed Tapalian that he wanted asphalt as the top coat, whereas the Agreement called for a less expensive stone-chip surface. Finally, Tusino insisted that Tapalian conduct unprecedented sieve tests on several gravel samples and that Tapalian use more expensive gravel. Tusino's assistant confided to Tapalian's contractor that Tusino was intent upon "deliberately busting [Tapalian's] balls."

In November 1998, Tapalian commenced a state court action for contempt against Tusino and the Town, which had superintended the Agreement, arguing that the imposition of the new conditions flagrantly violated the terms of the Agreement. The Town in turn commenced a lawsuit to enjoin Tapalian from cutting trees on the subdivision land until after he completed the specified updates to Davis Street.

On December 11, 1998, Tusino wrote to Tapalian, stating that he had issued an order on December 1 that all road construction projects in the Town were to cease for the winter.

-4-

Yet, notwithstanding the purported promulgation of this unprecedented moratorium, on December 17 Tusino issued a permit to another contractor, Kevin Murphy, to begin work on a nearby road construction project at the "Middlemarch" subdivision. Moreover, none of the additional conditions imposed upon Tapalian were imposed upon Murphy.

In the spring of 2000, Tapalian decided to proceed. He hired a contractor to dismantle the surface of Davis Street and install a new surface, as Tusino had insisted. Tusino then superimposed a host of additional, costly conditions. For instance, he demanded that the road be sprayed with calcium chloride, a procedure Tapalian's contractor deemed not only unprecedented but unnecessary. Finally, in the course of these discussions, Tusino informed Tapalian's contractor that he also expected to be provided with "a forty-foot boat and two girls."

Meanwhile, in November 2000, Tapalian and the Town settled the pending contempt action brought by Tapalian, as well as the Town's claim for injunctive relief, and the parties agreed to the appointment of an independent engineer to determine whether the final roadwork met the terms of their 1994 Agreement. Thus, Tusino was relieved of any oversight authority relating to the Davis Street project.

Soon after an independent engineer certified in 2000 that Tapalian was in compliance, Tapalian commenced the instant action

in federal district court against the Town and Tusino, alleging that Tusino's actions violated the Equal Protection Clause, see 42 U.S.C. § 1983, and demanding both compensatory and punitive damages. In due course, Tusino counterclaimed for defamation and infliction of emotional distress. After determining that the November 2000 settlement was res judicata, the district court dismissed the Tapalian claims against the Town. However, the district court denied the motion for summary judgment filed by Tusino, in his individual capacity, noting that Tusino had adduced no evidence that he was in privity with the Town in relation to the November 2000 settlement. Tapalian v. Town of Seekonk, 188 F. Supp.2d 136, 140-41 (D. Mass. 2002). Following an eleven-day trial, the jury found that Tusino had violated Tapalian's equal protection rights, then awarded Tapalian $58,843 in compensatory damages and $150,000 in punitive damages. Finally, the jury found for Tapalian on the two counterclaims brought by Tusino. Tusino now appeals from the judgment entered upon the jury verdict.

**II**

**DISCUSSION**

**A.   The Sufficiency of the Evidence**

First, Tusino contends that he is entitled to judgment, as a matter of law, because Tapalian failed to adduce sufficient evidence to establish all elements of his equal protection claim. Denials of motions for judgment as a matter of law are reviewed de

novo; and after viewing all the evidence and reasonable inferences therefrom (as well as credibility determinations) in the light most favorable to the nonmoving party, we will reverse the district court "'only if the facts and inferences point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have reached a verdict against that party.'" Santos v. Sunrise Med., Inc., 351 F.3d 587, 590 (1st Cir. 2003) (citation omitted).

The Equal Protection Clause contemplates that similarly situated persons are to receive substantially similar treatment from their government. See Barrington Cove Ltd. P'ship v. R.I. Hous. and Mortgage Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001). Accordingly, in order to establish his claim Tapalian had to adduce sufficient evidence from which a rational jury reasonably could conclude that, "compared with others similarly situated, [he] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Id. (emphasis added).

The Tapalian claim rests upon the latter prong, viz., an allegation of malice or bad faith. Normally, such a plaintiff must establish more than that the government official's actions were simply arbitrary or erroneous; instead, the plaintiff must establish that the defendant's actions constituted a "gross abuse of power." Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000); see

-7-

Rubinovitz v. Rogato, 60 F.3d 906, 912 (1st Cir. 1995) (noting that "gross abuse of power" may obtain where official harbors personal hostility toward plaintiff, and undertakes a "malicious orchestrated campaign causing substantial harm"); see also Village of Willowbrook v. Olech, 528 U.S. 562, 566 (2000) (Breyer, J., concurring) (noting that some otherwise "ordinary violations of city or state law" may become actionable under the equal protection clause provided the plaintiff proves "extra factor[s]," such as "vindictive action," "illegitimate animus" or "ill will"); Esmail v. Macrane, 53 F.3d 176, 179, 180 (7th Cir. 1995) (finding viable equal protection claim based upon (i) mayor's "orchestrated campaign of official harassment directed against [plaintiff] out of sheer malice" and (ii) "spiteful effort to 'get' [plaintiff] for reasons wholly unrelated to any legitimate state objective").

### 1. The "Similarly Situated" Standard

The determination as to whether individuals are "similarly situated" for equal protection purposes is an amorphous one. See Barrington Cove, 246 F.3d at 8. "'The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be

fair congeners. In other words, apples should be compared to apples.'" Id. (citation omitted).

Tusino contends on appeal (i) that Tapalian has adduced no evidence that the Davis Street project was similarly situated in all relevant respects to the Murphy road project in the nearby Middlemarch subdivision, (ii) that Tapalian's own investigator testified that there was "no comparison" between the two projects, and, thus, (iii) that Tapalian failed to establish that Tusino's imposition of different specifications for the two projects violated Tapalian's equal protection rights. These contentions fail.

The evidence adduced at trial did not preclude a rational jury from finding that Davis Street is similar to other road construction projects in Seekonk. See Santos, 351 F.3d at 590. Thus, this is one of those relatively rare cases in which the jury could directly compare an apple to an apple. The district court instructed the jury to compare the Davis Street project with the projects of "other individuals, including the Town of Seekonk and the town contractors." (Emphasis added.) As Tusino tendered no objection to the jury instruction, it became the law of the case. See Foster-Miller, Inc. v. Babcock & Wilcox Canada, 210 F.3d 1, 8 (1st Cir. 2000).

The distinctions suggested by Tusino – between Davis Street and Middlemarch – rest principally upon his premise that the

former project required heightened construction specifications because the public would utilize Davis Street more extensively than the Middlemarch Road. His public-welfare justification is belied, however, by the evidence that the Town itself had upgraded and widened Davis Street as recently as 1997, yet had not considered it necessary, in the interests of public safety, that it upgrade Davis Street to the more stringent specifications Tusino sought to impose upon Tapalian only a few months later, during early 1998. To cite but one instance, the Town admittedly did not dig roadside trenches to a depth of three feet. Thus, in light of the unobjected-to jury instruction, the jury remained free to infer that conditions at Davis Street were not such a special case, but instead were substantially similar to other road construction sites in Seekonk.

## 2. **The "Selective Treatment" Standard**

Tusino contends that his motion for judgment as a matter of law should have been granted because Tapalian adduced no evidence which would compel a jury to conclude that Tusino lacked a rational basis for according different treatment to the Davis Street project. Tusino asserts (i) that the Agreement explicitly provided that "[a]ll specifications for the paving of the Improved Davis Street . . . shall be as approved by the Director of the Seekonk [DPW]," and (ii) that the heightened specifications he imposed upon Tapalian were based upon his good-faith interpretation

-10-

of certain ambiguous terms in the Agreement. Each of these contentions is seriously flawed.

First, from the outset Tusino has misperceived the applicable standard of review. It is not necessary that the Tapalian evidence compel a jury finding of selective treatment, but simply that it permit such a rational inference. See Santos, 351 F.3d at 590.

Second, as previously stated, see supra Section II.A.1, the "public-safety" rationale Tusino offers for imposing stringent conditions upon Tapalian is undermined by the more lax specifications of the Town's earlier upgrade. Whatever ambiguities it may contain, the Agreement reasonably cannot be construed as according Tusino carte blanche to impose any specifications he deemed appropriate, including those which served no legitimate governmental purpose. See Esmail, 53 F.3d at 180.

Finally, yet most importantly, the trial record is laden with the language of personal malice and "bad faith" retaliation, aimed at punishing Tapalian immediately following his rejection of Tusino's request that Tapalian supply him with "two women." Although Tusino denies having made any such request, those credibility determinations were for the factfinder. See Santos, 351 F.3d at 590. By way of corroboration, Tapalian's contractor testified that Tusino subsequently stated that he wanted "a forty-foot boat and two girls." Moreover, the jury heard the testimony

-11-

of three women who had been propositioned by Tusino, at a time when Tusino was seeking sexual favors in exchange for jobs and/or his approval of construction projects. Moreover, even Tusino's own assistant stated that Tusino was "deliberately busting [Tapalian's] balls." Since we must presume that the jury believed these witnesses, as it was entitled to do, it rationally could infer that Tusino had engaged in a "malicious orchestrated campaign causing substantial harm," thereby constituting a gross abuse of power. Rubinovitz, 60 F.3d at 912.[1]

---

[1]Tusino asserts on appeal that the Tapalian equal protection claim is barred by the res judicata effect of the November 2000 settlement of the lawsuits between the Town and Tapalian, since Tusino substantially controlled that litigation. See In re Iannochino, 242 F.3d 36, 46 (1st Cir. 2001) (finding privity "'if a nonparty either substantially controlled a party's involvement in the initial litigation or, conversely, permitted a party to the initial litigation to function as his de facto representative'") (citation omitted). As Tusino failed to raise this argument in his Rule 50(a) motion at the close of the evidence, it is deemed waived on appeal. See Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 71-72 (1st Cir. 2001) (noting that party cannot raise an argument in a post-verdict Rule 50(b) motion which was not first raised in its Rule 50(a) motion at the close of the evidence). Moreover, even if the issue had not been waived, Tusino identifies no evidence to demonstrate how he controlled the prior litigation, see Tapalian, 188 F. Supp.2d at 140-41 (denying Tusino's motion for summary judgment based on res judicata defense, and noting that party asserting "substantial control" and "virtual representation" theories supporting res judicata has a demanding burden of proof), and it strains credulity to presume that Tusino substantially controlled litigation wherein the resultant settlement forced him to recuse himself from further oversight of the Davis Street project in favor of an independent engineer. Thus, we can perceive no plain error. See Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc) ("Failures to object, unless a true waiver is involved, are almost always subject to review for plain error.").

**B.    Punitive Damages**

Next, Tusino urges us to reduce or vacate the $150,000 punitive damages award.  Challenges to punitive damages awards are reviewed de novo, and are to be affirmed unless "'we find it "certain" that the amount in question exceeds that necessary to punish and deter the alleged misconduct.'"  Rivera-Torres v. Ortiz-Velez, 341 F.3d 86, 102 (1st Cir. 2003), cert. denied, 124 S. Ct. 1875 (2004).

In this regard, Tusino first contends that a juror's post-verdict comments, which appeared in a local newspaper, suggest that the jury improperly awarded high punitive damages in order to deter the Town, rather than Tusino.  We do not consider post-discharge comments made by jurors to the press, since but for an "extraneous influence" exception not applicable here, a party is prohibited from impugning a jury verdict by probing the mental processes of the jurors.  See United States v. Connolly, 341 F.3d 16, 34 (1st Cir. 2003); Lacy v. Gardino, 791 F.2d 980, 985 n.1 (1st Cir. 1986); Fed. R. Evid. 606(b).

Second, Tusino complains that Tapalian failed to adduce evidence of Tusino's financial circumstances, whereby the jury might have been enabled to determine that he could not afford a high punitive damages award.  The present argument ignores the principle that it is the defendant's burden – not the plaintiff's – to adduce evidence of the defendant's lack of financial

resources, see Brown v. Freedman Baking Co., 810 F.2d 6, 11 (1st Cir. 1987); Fishman v. Clancy, 763 F.2d 485, 490 (1st Cir. 1985); see also Provost v. City of Newburgh, 262 F.3d 146, 163 (2d Cir. 2001), and Tusino concededly failed to meet that burden.

Finally, Tusino contends that the evidence adduced at trial does not support the great disparity between the $58,843 compensatory damages award and the $150,000 punitive damages award. In assessing the reasonableness of a punitive damages award, we consider (i) the degree of reprehensibility of the defendant's conduct; (ii) the ratio between the punitive damages and the actual and potential damages; and (iii) the comparison between the punitive damages figure and other civil and criminal penalties imposed for comparable conduct. See Davis v. Rennie, 264 F.3d 86, 116 (1st Cir. 2001). The first criterion (reprehensibility) is by far "the most important indicium," id., and, after careful consideration, we have no hesitation in concluding that the prolonged personal vendetta Tusino conducted against Tapalian for having rejected Tusino's requests amply demonstrates the requisite degree of reprehensibility. With respect to the two latter criteria, the 3:1 ratio between the $58,843 compensatory damages award and the $150,000 punitive damages award does not approach the "shock the conscience" standard.

**Affirmed**.