# United States Court of Appeals

## For the First Circuit

No. 04-1028

DR. IRIS BETH RODRÍGUEZ-QUIÑONES,

Plaintiff, Appellee,

v.

JIMÉNEZ & RUIZ, S.E., d/b/a J & R LIMITED PARTNERSHIP;
DR. JORGE L. JIMÉNEZ-RIVERA; DR. OSCAR A. RUIZ-LACOMBA;
INTEGRAND ASSURANCE COMPANY,

Defendants, Appellants.
_____

CONSEJO DE TITULARES CONDOMINIO CLÍNICA LAS AMÉRICAS;
ROYAL & SUN ALLIANCE INSURANCE COMPANY OF PUERTO RICO, INC.;
J.R. ORTIZ SECURITY INC.; ACE INSURANCE COMPANY;
AMERICAN INTERNATIONAL INSURANCE COMPANY; A-Z INSURANCE COMPANY;
JOHN DOE 01CV2274,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before
Boudin, Chief Judge,
Cyr, Senior Circuit Judge,
and Lipez, Circuit Judge.

Marcos Valls-Sanchez with whom Cobián & Valls was on brief for appellants.
Judith Berkan with whom Mary Jo Mendez and Berkan/Mendez were on brief for appellee.

March 29, 2005

**BOUDIN, Chief Judge**.  This appeal arises from a tort action brought by Dr. Iris Beth Rodríguez-Quiñones ("Rodríguez") in diversity in the Puerto Rico federal district court.  The case arises from the rape and robbery of Rodríguez on April 28, 2000, at Clínica Las Américas ("Clínica")--a multi-condominium-unit medical clinic where she worked as a clinical psychologist--in Hato Rey, Puerto Rico.  The defendants were Clínica itself and a group--the "office 410 defendants"--composed of the owners of the office in which Rodríguez worked:  Dr. Jorge L. Jiménez Rivera ("Jiménez"), Dr. Oscar A. Ruiz Locomba ("Ruiz"), and a partnership named Jiménez & Ruiz, S.E.

Clínica operates a five-story office building containing about 40 health-care-related offices.  The health-care providers include doctors who own condominium office units in the building as well as doctors who rent office space from the owners.  Clínica also has multi-story parking garage next to the medical building, a ground-level parking lot, and grounds.  The building is governed by a board of directors, whose members are condominium unit owners, as well as by an Executive Committee.

Jiménez and Ruiz (through their partnership) were the owners of office 410 on the fourth floor of Clínica in which they ran a psychiatry and psychology practice.  Several other doctors paid to use space in the office for certain hours. Within office 410, a main door (used by patients) led from the Clínica fourth-

floor hallway into the waiting area. In the waiting area, an intermediate door gave access to the "back office" area containing individual rooms for the doctors and a receptionist's area; a window in the waiting area looked through to the receptionist's area.

Rodríguez had a lease with Jiménez and Ruiz allowing her to use one of the doctors' offices in office 410 for 20 hours per week--including 8 a.m. to 6 p.m. on Fridays--for her clinical therapy practice. On Friday afternoon, April 28, 2000, Rodríguez was working alone in office 410; no other doctors were present and the secretary had already left. Between 5:00 and 5:15 p.m., two young men (one with a glassy-eyed look) entered the office 410 waiting area in search of a physician. Rodríguez told them that there were no doctors available and, after a few minutes, they left. Concerned, Rodríguez attempted (without success) to contact Clínica security by calling the building's administrative office.

After 5:30 p.m., while Rodríguez was occupied with a young patient, the two men returned twice. On the second occasion, shortly after 6:00 p.m., the two men entered the waiting area and robbed the patient's mother. They then proceeded into the back area where Rodríguez and the patient were in Rodríguez' office, unsuccessfully searched the back office area for cash, and eventually raped and robbed Rodríguez. The attack caused Rodríguez to suffer such trauma that she was unable to continue as a clinical

psychologist in Puerto Rico and moved to New York where she found more modest employment.

Rodríguez filed suit in the district court in Puerto Rico, claiming that Clínica and the office 410 defendants were negligent in providing security in the Clínica building and office 410, respectively. After a seven-day trial the jury found the defendants negligent and found also that there was no "comparative negligence" by Rodríguez. The jury awarded Rodríguez $2 million in economic damages and $1.5 million for emotional and physical injury, assigning 60 percent responsibility to Clínica and 40 percent responsibility to the office 410 defendants.

The defendants filed motions for judgment as a matter of law and for a new trial or remittitur. Fed. R. Civ. P. 50, 59. They claimed (among other things) that there was insufficient evidence of their negligence, that the jury's refusal to find comparative negligence was mistaken, and that the award of economic damages was excessive. The trial court denied all motions save that, by remittitur, it reduced economic damages to $877,481.

The office 410 defendants (but not Clínica) now appeal. Denials of motions for judgment as a matter of law are reviewed de novo. The evidence and credibility issues are considered in the light most favorable to the verdict and we may reverse only if a reasonable jury could not have reached such a verdict. Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004); Trull v. Volkswagen of Am.,

-4-

Inc., 320 F.3d 1, 7-8 (1st Cir. 2002).  Denial of a motion for a new trial is ordinarily overturned only to prevent "a miscarriage of justice."  Trull, 320 F.3d at 8.

The appellants' main attack is based on a supposed lack of a duty of care and insufficient evidence of negligence on their part.  The pertinent evidence showed Clínica was located in a high-crime area within San Juan and that there were a good number of cash transactions in the offices.  The evidence also showed that numerous entrances led into the building and that security-guard coverage was limited.  No security cameras were used as of April 28, 2000, and Clínica had not implemented a number of security recommendations that had been made to its board.

Office 410 was the last office at the end of one of the wings; its entrance was about 15 to 20 feet from an exit to a stairwell and freight elevator that led down to a lateral door (open until late at night) that let out near the external parking lot.  About 10 percent of the patients in the office paid cash which was given to the office secretary and placed in envelopes in a drawer in the receptionist area.  Office 410 also had samples of pharmaceuticals in an unlocked cabinet in one of the interior offices.

The only security in place in office 410 consisted of the locks on the main door and the door between the waiting room and the back office area.  There was no electronic locking system,

-5-

"buzzer" entry system, or security camera. The regular practice was to leave the door to the hallway open at all times when there were people in the office. The secretaries regularly left the office at 5:00 or 5:30 p.m., frequently leaving one or more doctors alone in the evening. No instructions were given to the employees or tenants about locking the door.

There was mixed evidence as to Jiménez' and Ruiz' awareness of prior incidents of criminal conduct at Clínica within the two years preceding the rape. These incidents included a break-in during July 1998 at the building administration offices during which petty cash was stolen; an armed robbery in March 1999 in the parking garage; and an incident in November 1999 during which five offices on the third, fourth, and fifth floors were burglarized.

Jiménez and Ruiz denied knowing about any of these incidents prior to the litigation. Nevertheless, there was documentary evidence that Ruiz was on the Clínica board when the break-in occurred in Clínica's administrative office. Jiménez was a member of the board in 1998-1999, and was secretary from 1999 to 2002 (and was part of the executive committee), a period encompassing both the garage robbery and the burglary of five offices.

Puerto Rico's Civil Code imposes liability for an "act or omission" that "causes damages to another through fault or

negligence," article 1802, 31 P.R. Laws Ann. § 5141 (1990); and "fault or negligence" may be based on "the omission of the steps which may be required by the character of the obligation and which may pertain to the circumstances of the persons, time, and place," article 1057, 31 P.R. Laws Ann. § 3021 (1990). See Coyne v. Taber Partners I, 53 F.3d 454, 458 (1st Cir. 1995); Rivera Perez v. Cruz Corchado, 19 P.R. Offic. Trans. 10, 21 (1987). In the case of an omission, the defendant must have been under a duty to act--here, a duty to "provide security commensurate with the circumstances attendant to their operations." Coyne, 53 F.3d at 458.

Jiménez and Ruiz argue that Puerto Rico law "does not recognize or impose upon owners and lessors of office buildings a general legal obligation to provide heightened security." They rely upon cases like Jacob v. Eagle Star Insurance Co., 640 F. Supp. 117, 118 (D.P.R. 1986), which stated that "[o]rdinarily, a person is not responsible in tort for criminal conduct of third parties," and Estremera v. Inmobiliaria Rac, Inc., 9 P.R. Offic. Trans. 1150, 1154 (1980), which said that violence is "primarily a problem of public safety and a responsibility of the State," and continued:

> [C]ontracting parties cannot be held liable
> for the occurrence of a crime within their
> company's premises, unless the same are of a
> nature that demand a wider scope of protection
> and security than can be supplied by law-
> enforcement agencies.

However, <u>Elba A.B.M.</u> v. <u>Univ. of P.R.</u>, 25 P.R. Offic. Trans. 294, 125 D.P.R. 294, 299 (1990), did impose liability on a university for a criminal's attack on a student, equating the school to hotels, schools and hospitals which provide services of an "essential nature." <u>Accord</u>, <u>Estremera</u>, 9 Offic. Trans. at 1154. The court in <u>Elba</u> also stressed the vulnerable nature of the student population, the school's location in a high-crime area, and its operation as an enclave which local police did not ordinarily enter. 25 P.R. Offic. Trans. 294, 125 D.P.R. at 311, 315-18.

Similarly, the court in <u>J.A.D.M.</u> v. <u>Plaza Carolina Shopping Mall</u>, 132 D.P.R. 785, 791, 1993 P.R.-Eng. 840023 (1993), imposed a duty to provide security on large shopping malls. It noted that the variety of services offered in such centers--by government offices (<u>e.g.</u>, post offices and utility offices), commercial enterprises, and entertainment establishments--made them like a "public square[]" and thus meant they provided essential services. <u>Id.</u> The decision said that the "duty to provide adequate and reasonable security" is based on both "the nature of the activity conducted . . . and on the foreseeability of criminal activity." <u>Id.</u> at 801.

Applying these criteria to the case at hand, it is easy to conclude that Clínica did have a duty to provide security. But the harder question is whether the Puerto Rico courts would impose on Jiménez and Ruiz a duty to provide security in office 410 to

protect their part-time physician tenants. On the one hand, the individual Clínica offices, like the building itself, are within a high-crime area; cash transactions occur within the building; and persons can freely enter the main building and then proceed to individual offices where they are not visible to such few security guards as may patrol the building and garage. Enhanced danger is certainly foreseeable.

On the other hand, the Puerto Rico Supreme Court has shown evident reluctance to create duties disproportionate to the ability of business to protect against dangers of wrongdoing by third parties. See J.A.D.M., 132 D.P.R. at 799, 1993 P.R.-Eng. 840023 (noting that imposing liability too easily would mean that "every store or warehouse would have to be policed by the owner"); cf. Jacobs, 640 F. Supp. at 119 (taxi operator is not liable for criminal attacks on passengers). Yet, despite these hesitations, the Puerto Rico courts have not suggested that small businesses are automatically exempt from providing reasonable protection against known dangers, whether by warnings, security features or otherwise.

All we can say is that the Commonwealth courts have not clearly drawn a line cutting off liability. While the Puerto Rican courts may well pause before requiring every small business to provide a security guard, the duties sought to be imposed in this case are far more moderate. The appellants here operated a small indoor facility and could easily have improved security at modest

expense--here, by installing a security camera and buzzer system and by changing some of its office practices. Indeed, there is no indication that Rodríguez was even warned of crimes committed earlier on the premises.

The jury in this case was instructed that an owner or lessor has no duty to protect tenants from criminal acts unless they are foreseeable; that institutions providing "essential services" have a heightened responsibility to provide security; that there is no duty to protect against the general level of criminality that exists in society; and that the defendants in this case had to maintain "reasonable security measures for the protection of [their] guests and patients." We are not prepared to say that this summary of Puerto Rico law is mistaken.

The office 410 defendants say that the kind of violent attack that occurred was not foreseeable and that the earlier incidents involved petty property theft or were "outside" in the garage. In fact, the perpetrators in this case sought cash in the back area of the office and found none before turning on Rodríguez herself. Further, an armed robbery--an episode with an obvious potential for great harm--had occurred in the attached garage building. Despite defendants' denials, the jury could have concluded from the evidence already described that the defendants' connections with the building would have given them some knowledge of the prior episodes.

As for negligence, the parties stipulated that the cost of an electronic lock would have been $285; of a buzzer $45; and of a security camera $78, and that these devices could have been installed at Office 410.  From this evidence, a jury could have rationally concluded that such relatively low-cost measures, along with changing office practice to locking the front door (and requiring patients to ring a buzzer) in the late afternoon when no one was at the front desk, were required for adequate security and that these measures would have prevented the rape.

The jury declined to find that Rodríguez was comparatively negligent, leaving the defendants liable for the full damages.  See 31 P.R. Laws Ann. § 5141; Mejias-Quiros v. Maxxam Prop. Corp., 108 F.3d 425, 427 (1st Cir. 1997).  Jiménez and Ruiz say this was error because--for example--Rodríguez was already suspicious of the assailants and did no more than seek to call security and then failed to lock the outer door even though her last patient had arrived.  In deciding what a reasonable person could do, a jury's latitude is considerable and we do not think that comparative negligence was present as a matter of law.

Finally, the office 410 defendants say that the trial court's reduction of economic damages from $2 million to about $877,000 was inadequate.  At trial each side had by agreement submitted expert reports on lost income in lieu of testimony.  Rodríguez' expert estimated an annual "maximum potential gross

-11-

income" for her of $165,966 based on an estimated number of sessions with patients and other expected work (e.g., teaching); but in his damage calculations, the expert employed a figure of $110,000 offered by Rodríguez herself, describing it as "conservative." This led the expert to support at trial a total net figure for economic damages of $332,000.[1]

The district judge deemed the jury's $2 million figure excessive but did not reduce the damages back to $332,000. Instead, the district court adopted $877,000 as the figure needed to avoid a new trial. The judge reached this figure by substituting, in the expert's earlier computation, the expert's original estimate of annual gross income for Rodríguez (about $166,000) in place of Rodríguez' own estimate ($110,000). The appellants say that the expert's ultimate $332,000 figure (predicated on the $110,000 estimated income) should have capped Rodríguez' economic recovery.

Where the jury exceeds a rationally supportable figure, the judge's remittitur figure must be within the range rationally supported by evidence. See Wagenmann v. Adams, 829 F.2d 196, 215 (1st Cir. 1987); Segal v. Gilbert Color Sys., 746 F.2d 78, 81 (1st Cir. 1984). We conclude that the $877,000 figure is supported by

---

[1]The $332,000 figure was derived by reducing the annual estimated gross income in each year by both (1) the estimated expenses that would have been incurred and (2) the net income that Rodríguez was expected to earn in her new job, and then discounting the projected annual differentials to present value.

the record.  A fact-finder might well choose to hold Rodríguez to her own horseback estimate of $110,000 but the evidence contained the fully explained $166,000 figure as well as the computation needed to derive the $877,000 total.

Affirmed.