# United States Court of Appeals
## For the First Circuit

No. 04-1492

MIRLA MIREYA RODRÍGUEZ-MARÍN;
ANA I. ESCOBAR-PABÓN,

Plaintiffs, Appellees,

v.

VÍCTOR RIVERA-GONZÁLEZ, in his personal capacity and
in his official capacity as Secretary of Corrections and
Administrator of the Administration of Corrections
of Puerto Rico; and ANA T. DÁVILA-LAO, in her personal
capacity and in her official capacity as Counsel to the
Administration of Corrections of Puerto Rico,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José A. Fusté, U.S. District Judge]

Before

Torruella, Lipez and Howard,
Circuit Judges.

Isabel M. Rodríguez-Casellas, with whom Sánchez Betances,
Sifre, Muñoz-Noya & Rivera P.S.C. and Milagros del Carmen López,
were on brief, for appellants.
Francisco R. González-Colón, with whom F.R. González Law
Office, was on brief, for appellees.

February 16, 2006

**TORRUELLA, Circuit Judge**. Plaintiffs are employees of the Administration of Corrections in Puerto Rico. They filed suit under 42 U.S.C. § 1983, claiming that defendants demoted them in violation of their First Amendment and due process rights. The case went to trial, and a jury found in favor of plaintiffs, awarding them compensatory and punitive damages. Defendants now appeal. We affirm.

## I. Background

Defendants are contesting the jury's verdict in favor of the plaintiffs. In considering the issues raised on appeal, we do not evaluate the credibility of the witnesses or weigh the evidence. Vázquez-Valentín v. Santiago-Díaz, 385 F.3d 23, 29 (1st Cir. 2004). Rather, we construe all rational inferences in favor of the jury's verdict. Id. at 29-30. We now summarize the evidence presented at trial.

Discrimination based on political-party affiliation is rampant in government employment in Puerto Rico. See, e.g., Pérez v. Zayas, 396 F. Supp. 2d 90 (D.P.R. 2005); Román Román v. Delgado Altieri, 390 F. Supp. 2d 94 (D.P.R. 2005); Padilla Román v. Hernández Pérez, 381 F. Supp. 2d 17 (D.P.R. 2005); Sueiro Vázquez v. Torregrosa De la Rosa, 380 F. Supp. 2d 63 (D.P.R. 2005); Rovira Rivera v. P.R. Elec. Power Auth., 364 F. Supp. 2d 154 (D.P.R. 2005); Irizarry-López v. Torres-González, 363 F. Supp. 2d 7 (D.P.R. 2005). It has cost Puerto Rican taxpayers dearly in verdicts paid

from public funds.  P.R. Laws Ann. tit. 31, § 5142.  In an effort to combat political discrimination, Puerto Rico has an Electoral Moratorium that prohibits certain "appointments, promotions, demotions, transfers and changes in the category of the employees" for the two months before and after a general election.  P.R. Laws Ann. tit. 3, § 1337.  In the year 2000, general elections were held on November 8, 2000, so the Moratorium commenced on September 8, 2000 and ended on January 8, 2001.

Before the 2000 election, the Governor of Puerto Rico was a member of the New Progressive Party ("NPP").  Immediately prior to the commencement of the Electoral Moratorium, at least thirty-four personnel changes took place in the Administration of Corrections ("AOC").  These personnel changes were authorized by the Administrator of the AOC, Zoé Laboy ("Laboy"), who had been appointed by the NPP Governor.

In the 2000 election, a member of the Popular Democratic Party ("PDP") was elected Governor.  The new Governor appointed defendant Víctor Rivera-González ("Rivera-González") as Administrator of the AOC, who in turn appointed defendant Ana Dávila-Lao ("Dávila") as his Chief Legal Advisor.  The human resources director under the former administration, who later became Rivera-González's assistant, told Rivera-González that some appointments made by the previous administration may have been unlawful.  Rivera-González asked Dávila to investigate the matter.

Dávila then proceeded to conduct a review of the thirty-four personnel changes that took place immediately before the Electoral Moratorium. This list of thirty-four included every member of Laboy's staff, except for one who was a PDP member.[1] It was determined that eighteen of these thirty-four personnel changes were illegal, and these personnel changes were revoked. Two of the eighteen people affected were plaintiffs Mirla M. Rodríguez-Marín ("Rodríguez") and Ana I. Escobar-Pabón ("Escobar"). Dávila asserts that this review was objective and denied knowing either Rodríguez's or Escobar's political affiliation.

## A. Mirla M. Rodríguez-Marín

Rodríguez began working for the AOC in 1994 in the position of Social-Penal Technician I, a career position.[2] Over the years, she was promoted to a number of trust positions: Special Assistant II, Director of Legal Affairs, and Executive Aide of Correctional Services. In the summer of 2000, the AOC implemented a Classification and Compensation Plan ("the Plan"), whereby employees were evaluated and reclassified into appropriate

---

[1] The trial testimony did not clearly indicate whether this list of thirty-four consisted entirely of NPP supporters or affiliates, but it is a reasonable inference to make from the testimony.

[2] A career position is subject to the merit principle, whereby a competitive process is used to fill the position. An employee in a career position has a due process right to that position and cannot be removed without cause. In contrast, a trust position is not subject to the merit principle, and an employee in a trust position may be removed without cause. Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 134 (1st Cir. 2005).

positions. Under the Plan, Rodríguez was classified as Director of the Legal Division, a trust position. Rodríguez met with Laboy and requested to be classified into the career position of attorney. On September 7, 2000, one day before the commencement of the Electoral Moratorium, Rodríguez received four letters notifying her of changes in her employment status. The first letter reinstated her to the career position of Social-Penal Technician I; the second promoted her to the career position of Attorney I, with a one-year probationary period; the third raised her salary to the maximum allowable for that position; and the fourth ordered her to continue serving in her current trust position, indicating that her probation term for the Attorney I position would begin at the conclusion of the trust position.

When Rivera-González was appointed Administrator in January 2001, he became Rodríguez's direct supervisor. She testified that during this time, Rivera-González made several comments to her to the effect that he was under political pressure for leaving too many NPP members in cushy positions at the AOC. Rivera-González denied making such statements. In March 2001, Rivera-González removed Rodríguez from her trust position and reinstated her to her career position of Attorney I. Rodríguez does not contest the removal from her trust position.

Rodríguez alleges that she was mistreated because of her political affiliation. At one point, she went to her office and

discovered that her desk had been taken away, with her computer and other belongings strewn across the floor. After she complained, an old, surplus desk was placed in the office. The person in charge of maintenance refused to clean her office because she was a member of the NPP. Because of this mistreatment, Rodríguez asked to be transferred to Ponce.

In Ponce, Rodríguez was litigating cases for the AOC and Dávila was her supervisor. In June 2001, four agents came to her desk to deliver a letter annulling her promotion to Attorney I and reinstating her as a Social-Penal Technician I. She found it humiliating that four agents would be sent, implying that she was a dangerous person. She was not given a hearing or any warning before being demoted. She received another letter assigning her to the Ponce maximum security facility, where dangerous criminals were held and against whom she had litigated cases. Because of this, she feared working there.

Rodríguez went to see Rivera-González, and he referred her to Dávila because she was the chairperson of the committee reviewing the promotions and she had issued the recommendation that the promotion was unlawful. Dávila told her that she was not entitled to a hearing because the appointment was illegal. Rodríguez testified that Dávila told her that she could not be left in such a cushy position with such a high salary, but Dávila denied saying this.

The demotion letter stated that "there [was] no evidence on file of compliance with the due process of law in the recruitment and selection for [her] appointment." When Rodríguez went to examine her personnel file, she discovered that it was being held by Dávila, even though access to a personnel file requires the employee's authorization, and Rodríguez had not given authorization. Rodríguez discovered that papers documenting her promotion were missing from her file. This was corroborated by Marie Rivera, an employee in the human resources office, who testified that documents were missing from Rodríguez's file. Rodríguez had the original versions of these missing papers, and she showed them to Rivera-González. Rodríguez threatened legal action over the missing documents, and the missing documents mysteriously reappeared in her file. Dávila insisted that even though the missing documents had been replaced, Rodríguez's appointment was still illegal. The director of recruitment, Héctor Rivera-Rivera, testified that he certified that Rodríguez's appointment to Attorney I had been lawful.

In July 2002, one year after she had been demoted, Rodríguez filed this suit. In September 2002, after learning from Héctor Rivera-Rivera that the appointment had been lawful, Rivera-González ordered that Rodríguez be reinstated. Rivera-González testified that she was a competent employee. She received a letter informing her of the reinstatement, which stated that her salary

would be determined later. For the first two months after being reinstated, she was not paid and was not given an office. She then went to Rivera-González, and he assigned attorney Gloria Ortiz-Martínez to evaluate the situation. Ortiz testified that she was unable to work on the case because she needed Rodríguez's personnel file and Dávila did not give it to her despite being asked to do so. Rodríguez testified that, after again going to Rivera-González, he advised her to wait until Dávila's forthcoming transfer to another government agency. He denied making this statement.

Rodríguez also testified as to Dávila's personal involvement in revoking her promotion. She testified that Rivera-González and Raymond Mira, the director of human resources, stated in depositions that Dávila was a member of the transition committee of the PDP for the corrections administration and was also a political liaison between the governor's office and the corrections administration. She also testified that personnel directors stated in their depositions that Dávila initiated the review of the thirty-four personnel changes, and that José Ortiz, who was director of human resources at the time, stated that her appointment was legal.

As a result of her demotion, Rodríguez suffered emotionally and financially. She suffered depression from the stigma of the demotion, which caused her to have nightmares and

fight with her family.  She underwent emotional therapy for one year.  With her greatly diminished salary, she was unable to pay her bills and her credit was damaged.

## B.  Ana I. Escobar-Pabón

Escobar began working for the AOC in 1986 in the career position of Social-Penal Technician I, and she was later promoted to Social-Penal Technician IV.  Beginning in 1994, she was appointed to a number of trust positions.  In June 2000, the AOC created a new career position of Regional Head of Programs and Services ("Regional Head").  After this position was announced, the AOC decided to revise the job requirements because of complaints that the requirements were not appropriate.  Laboy approved the revised job requirements on September 7, 2000 and made them effective as of June 1, 2000.  Laboy appointed Escobar Regional Head on September 6, 2000, which was one day before the approval of the revised requirements and two days before the commencement of the Electoral Moratorium.

Escobar testified that after the election on November 7, 2000, her co-workers started harassing her because of her political affiliation, stating that they would "ravage" NPP members.  She testified that her supervisor, Ramón Díaz-Ferrera, was an active member of the PDP and would criticize her when she used the term "government of Puerto Rico" and insisted that she say "Commonwealth of Puerto Rico," a term preferred by the PDP.  He denied making

-9-

such statements on a regular basis but did admit to once correcting an employee who used the term "state government" and instructed him to use the term "central government" when referring to the Commonwealth of Puerto Rico.  Another officer of the agency, José Cordero-Padró, told her that they were going to "drag away" NPP members and put an end to corruption.

In July 2001, four employees came to her desk to deliver a letter informing her that her appointment as Regional Head had been declared null.  She was reinstated to her previous vested career position of Social-Penal Technician IV.  She had no notice that her appointment was being evaluated.  Her letter also stated "there [was] no evidence on file of compliance with the due process of law in the recruitment and selection for [her] appointment."  She met with Dávila, who told her that necessary documentation was not present in her file.  She had copies of these missing documents and gave them to Dávila.  Dávila later told her that even with all of the documentation she had not complied with all the requirements for the position.  Héctor Rivera-Rivera, the director of recruitment, testified that he certified that Escobar satisfied the originally posted requirements for the position of Regional Head and also that she was qualified under the amended job requirements dated September 7, 2001.  Raymond Mira, the director of human resources, testified that Escobar's appointment was void because the job description was amended after her appointment and that this

-10-

violated the principle of merit. Neither Rivera-Rivera nor Mira gave further explanation as to the legality or illegality of Escobar's appointment.

As a result of her demotion, Escobar testified that she had to seek psychological help, was unable to sleep, and because she could not afford to pay her bills, her credit was harmed. While this lawsuit was pending, she was promoted to Correctional Facilities Superintendent II, but was then again demoted to her current position of Social Penal Technician IV.

## C. Procedural History

Rodríguez and Escobar filed suit against Rivera-González and Dávila, claiming political discrimination and a violation of procedural due process rights. After a five-day trial, the jury found in favor of Rodríguez and Escobar on both their political discrimination and procedural due process claims. The jury awarded Rodríguez back pay of $3,500 per month, $180,000 in compensatory damages, and $120,000 in punitive damages against Dávila. The jury awarded Escobar back pay of $3,306 per month, $105,000 in compensatory damages, and $195,000 in punitive damages against Dávila.

Defendants made the full panoply of motions, moving for dismissal under Rule 12(b)(6), judgment as a matter of law under Rules 50(a) and 50(b), a new trial under Rule 59(a), and an altered judgment under Rule 59(e). The district court denied all of their

motions. Defendants now appeal the denial of all of their motions on various grounds: (1) the denial of their Rule 50(a), 50(b), 59(a), and 59(e) motions contesting the jury's finding that defendants violated plaintiffs' procedural due process rights; (2) the denial of their Rule 50(a), 50(b), 59(a), and 59(e) motions contesting the jury's finding that defendants politically discriminated against plaintiffs; (3) the denial of their Rule 12(b)(6), 50(a), 50(b), 59(a), and 59(e) motions asserting the qualified immunity defense; and (4) the denial of their Rule 50(b), 59(a), and 59(e) motions contesting the compensatory and punitive damages awards as excessive. Because we affirm the jury's verdict that defendants politically discriminated against plaintiffs, we decline to consider the alternative ground that defendants violated plaintiffs' due process rights. We address defendants' arguments in turn.

## II. Political Discrimination

The jury found that defendants discriminated against both plaintiffs on the basis of their political affiliation. On appeal, defendants challenge the jury's verdict on three grounds: (1) there was insufficient evidence of discriminatory animus;[3] (2) the district court erred in instructing the jury on the defense

---

[3] Defendants separately argue that Escobar presented insufficient evidence that defendants had knowledge of her political affiliation. We consider this argument along with the argument alleging insufficient evidence of discriminatory animus.

-12-

articulated in Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977); and (3) there was sufficient evidence for a jury to grant the Mt. Healthy defense.

## A. Insufficient Evidence of Discriminatory Animus

The First Amendment protects the right of public career employees -- those not in trust or policy-making positions -- to engage in political activities without fear of adverse employment actions. Padilla-García v. José Guillermo Rodríguez, 212 F.3d 69, 74 (1st Cir. 2000). It is undisputed that Rodríguez and Escobar were public career employees at the time they suffered adverse employment actions. The plaintiffs here "bear[] the burden of producing sufficient direct or circumstantial evidence from which a jury reasonably may infer that [their] constitutionally protected conduct -- in this case, political affiliation with the NPP -- was a 'substantial' or 'motivating' factor behind [their demotions]." Vázquez-Valentín, 385 F.3d at 30 (internal quotation marks and alterations omitted).

Defendants assert on appeal that the district court improperly denied their Rule 50(a), 50(b), 59(a), and 59(e) motions contesting the jury's finding of political discrimination. In their brief, defendants developed only the argument that the evidence was insufficient for a jury to find discriminatory animus. We thus address only defendants' Rule 50 argument and consider the

other arguments waived.[4]  Acevedo-García v. Monroig, 351 F.3d 547, 561 (1st Cir. 2003) ("We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation." (internal quotation marks omitted)).  We review the denial of a Rule 50 motion for judgment as a matter of law de novo.  Zachar v. Lee, 363 F.3d 70, 73 (1st Cir. 2004).  We will affirm "unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment."  Sheils Title Co. v. Commonwealth Land Title Ins. Co., 184 F.3d 10, 19 (1st Cir. 1999) (internal quotation marks and citation omitted).  We have no trouble finding that plaintiffs presented sufficient evidence for a reasonable jury to find that plaintiffs' political affiliations were a substantial or motivating factor behind their demotions.

First, plaintiffs presented ample evidence that their demotions were improper and the result of discrimination. Rodríguez and Escobar were long-standing employees of the AOC -- Rodríguez since 1994 and Escobar since 1986 -- and both were considered competent employees.  It is suspicious that both of them were demoted without being given any notice or opportunity to

---

[4]  Defendants also assert in their Rule 50 argument that the district court erred in allowing hearsay testimony and other improper evidence.  These arguments are also not developed and considered waived.

-14-

defend their promotions, especially since the initial explanation offered for the demotions was simply missing documentation. One would expect that Rodríguez and Escobar would first be consulted to determine if the necessary documentation had been misplaced. Further, these missing documents mysteriously reappeared after Rodríguez and Escobar presented their copies of the missing documents, and Rodríguez threatened an investigation over the missing documents. Even after the missing documents were replaced, Rodríguez and Escobar were not reinstated; rather, other justifications were given for their demotions. Finally, Rodríguez and Escobar's demotions appeared to be punitive. Rodríguez -- despite her competency, experience, law degree, and notary certification -- was reinstated into the low position of Social-Penal Technician I and placed in a dangerous environment at the maximum security prison in Ponce. Similarly, Escobar -- despite her 14 years of experience with the AOC and having nearly finished her probationary period as Regional Head -- was demoted to Social-Penal Technician IV.

Second, plaintiffs presented sufficient evidence that Dávila made the decision to demote them. Dávila wrote a letter to the human resources department, asking that the personnel files of thirty-four employees, including Rodríguez and Escobar, be evaluated. After Rodríguez was demoted, she went to see Rivera-González, and he referred her to Dávila. Dávila told her that her

promotion was unlawful and that she was not entitled to a hearing. When Rodríguez sought to examine her personnel file, she discovered that Dávila was in possession of it. When another attorney, Gloria Ortiz, was assigned to evaluate Rodríguez's case, Dávila did not give Ortiz the file despite being asked to do so. Escobar also consulted Rivera-González after being demoted, and he advised her to speak with Dávila. Dávila told her that documents were missing from her file, and Escobar supplied Dávila with the missing documents. At a later meeting, Dávila told her that even with all the documentation, her demotion would stand because she had not met all the requirements for the position.

Third, plaintiffs presented sufficient evidence that the discrimination was based on political affiliation. The review was instigated by Dávila (acting on behalf of the incoming PDP administration) and every employee of Zoé Laboy (a member of the outgoing NPP administration) had his or her file reviewed except for one, who happened to be a member of the PDP. Such a review is not necessarily improper, as the PDP administration may certainly investigate potential illegal appointments by the NPP administration. However, it suggests that Dávila knew that both Rodríguez and Escobar were NPP supporters. Rodríguez testified that both Rivera-González and Dávila made statements to her indicating that her demotion was politically motivated. Rivera-González and Dávila denied making such statements, but it is for

the jury to resolve such issues of credibility.  Finally, both Rodríguez and Escobar testified that co-workers harassed them because of their political affiliation.  This harassment provides further evidence that Rodríguez and Escobar's political affiliation was known among the employees of the AOC and indirect evidence that Dávila would also have been aware of their political affiliation.

**B.  <u>Mt. Healthy</u> Defense**

Under certain circumstances, defendants may still prevail even if plaintiffs show that their political affiliations were a substantial or motivating factor behind their demotions.  <u>Mt. Healthy</u>, 429 U.S. at 287.  The <u>Mt. Healthy</u> defense is an affirmative defense available to defendants, whereby defendants must prove by a preponderance of the evidence that the plaintiffs would have been dismissed regardless of their political affiliation.  <u>Id.</u>; <u>Vázquez-Valentín</u>, 385 F.3d at 30.  Thus, even if political affiliation was an improper consideration, defendants will prevail if they can show that plaintiffs' political affiliation was not the "but-for" cause of their demotions. <u>Tejada-Batista</u> v. <u>Morales</u>, 424 F.3d 97, 102 (1st Cir. 2005); <u>Sánchez-López</u> v. <u>Fuentes-Pujols</u>, 375 F.3d 121, 130 (1st Cir. 2004). The purpose of the defense is to prevent a plaintiff from being put "in a better position as a result of the exercise of constitutionally protected conduct than [she] would have occupied had [she] done nothing." <u>Mt. Healthy</u>, 429 U.S. at 285.

-17-

Defendants assert on appeal that the district court improperly denied their Rule 50(a), 50(b), 59(a), and 59(e) motions regarding their Mt. Healthy defense.  In their brief, they develop only two arguments: first, that they presented sufficient evidence for a jury to find a successful Mt. Healthy defense, and second, that the district court improperly refused to include a jury instruction describing the Mt. Healthy defense.  We address these arguments in turn.

We first address defendants' argument of sufficient evidence for the Mt. Healthy defense.  In their brief, defendants state the "evidence was sufficient for a reasonable jury to find that Defendants prevailed in their Mt. Healthy defense."  They further note that they "presented evidence proving that they would have made the same employment determinations based on the legitimate nondiscriminatory justification of complying with Puerto Rico personnel law."  In support of this argument, defendants cite only one case, Vázquez-Valentín, for their proposition that "the demotion of a public employee resulting from the failure of her appointment to comply with personnel laws and regulations, constituted sufficient evidence to satisfy Mt. Healthy."

Defendants' argument, however, does not address the required legal standard.  In order for defendants to prevail on this Rule 50 or sufficiency of the evidence claim, they need to show that no reasonable jury could have denied their Mt. Healthy

defense. See Sheils Title Co., 184 F.3d at 19. A showing that defendants presented sufficient evidence for a jury to grant their Mt. Healthy defense clearly does not meet this burden. The case they rely on, Vázquez-Valentín, does not support the proposition they cite it for and did not even reach the Mt. Healthy defense. In Vázquez-Valentín, we found that no reasonable jury could have found "that plaintiff's political affiliation was a substantial or motivating factor in [the] adverse employment action." 385 F.3d at 40.

Even if defendants had argued that no reasonable jury could deny their Mt. Healthy defense under the appropriate legal standard, they would be incorrect. At trial, plaintiffs and defendants presented conflicting evidence as to the legality of plaintiffs' appointments. Notably, Héctor Rivera-Rivera, the director of recruitment, testified that he certified that plaintiffs' appointments were legal. A reasonable jury could certainly find that political affiliation, not the legality of the appointments, was the "but-for" cause of the demotions. Therefore, defendants' Mt. Healthy defense must fail.

We next address defendants' contention that the district court improperly refused to include a jury instruction describing the Mt. Healthy defense. Defendants submitted proposed jury instructions for the Mt. Healthy defense. Defendants contend that

they properly preserved this issue for appeal.  The portion of the

transcript cited by defendants follows:

>MS. RODRIGUEZ: Okay.  And regarding the good faith defense and the personal --
>
>THE COURT: What do you mean by "good faith"?
>
>MS. RODRIGUEZ: It is the defendants' reasonable belief that they were acting by authority of a valid statute.
>
>THE COURT: I gave the instruction that says, "If there were other reasons, whether good or bad, proper or improper, likeable or unlikeable, that motivated their actions, that were not political discrimination, there is no case."  I said that.
>
>THE COURT: That's it.  Very well.

To preserve an objection to a jury instruction for appeal, a party

must "stat[e] distinctly the matter objected to and the grounds of

the objection."  Fed. R. Civ. P. 51(c)(1).  Defendants' statement

above does not constitute an objection to the Mt. Healthy

instruction.  Indeed, in another portion of defendants' brief, they

argue that this exact same language constitutes an objection to the

district court's jury instructions on qualified immunity.

Because defendants did not object to the district court's

jury instructions regarding the Mt. Healthy defense, we review for

plain error.  Drohan v. Vaughn, 176 F.3d 17, 21 (1st Cir. 1999).

"Thus, we reverse only if there is a 'plain' or 'obvious' error

that 'affect[s] substantial rights' and which has resulted in a

'miscarriage of justice or has undermined the integrity of the

-20-

judicial process.'"  Id. (quoting Wilson v. Maritime Overseas Corp., 150 F.3d 1, 6-7 (1st Cir. 1998)).

We find no plain error.  The district court gave a jury instruction regarding the Mt. Healthy defense: "It is sufficient if the plaintiffs prove that their protected political activities were the determinative factor in the consideration that was made, and that it made a difference in the defendants' decision."  This instruction contains the substance of the Mt. Healthy defense.  In order to prevail on the Mt. Healthy defense, defendants must show that plaintiffs would have been demoted regardless of their political affiliation.  Thus, if plaintiffs' political affiliation was a "determinative factor" or "made a difference," defendants cannot claim that plaintiffs would have been demoted regardless of their political affiliation.  Although the district court could have been clearer in instructing the jury on the Mt. Healthy defense and should have included the Mt. Healthy defense on the verdict form,[5] the trial was certainly not a "miscarriage of justice" and did not "undermine[] the integrity of the judicial process."  Wilson, 150 F.3d at 7 (internal quotation marks omitted).

---

[5] We suggested in Sánchez-López (published after the trial in this case) that district courts include a question on the jury verdict form that explicitly incorporates the Mt. Healthy defense. Sánchez-López, 375 F.3d at 135.  Defendants have not contested the jury verdict form on appeal.

-21-

### III. Qualified Immunity

"Qualified immunity specially protects public officials from the specter of damages liability for judgment calls made in a legally uncertain environment." Ryder v. United States, 515 U.S. 177, 185 (1995). An official is entitled to qualified immunity unless (1) "the plaintiffs' allegations, if true, establish a constitutional violation," (2) "the right was clearly established at the time of the alleged violation," and (3) "a reasonable [official], similarly situated, would understand that the challenged conduct violated that established right." Suboh v. Dist. Attorney's Office, 298 F.3d 81, 90 (1st Cir. 2002). The first two prongs of this test are questions of law for the court to decide. Id. The third prong is also a question of law, but factual questions, to the extent they are antecedent to this determination, must be determined by a jury. Id. While preliminary factual questions regarding qualified immunity are sent to the jury, the legal question of the availability of qualified immunity is "ultimately committed to the court's judgment." Acevedo-García, 351 F.3d at 563.

Defendants first contend that the district court erred in failing to instruct the jury on qualified immunity. Defendants, however, are not entitled to a jury instruction regarding qualified immunity, since it is a legal question for the court to decide. See id. Defendants are entitled to have a jury determine any

-22-

preliminary factual questions, but defendants have not stated, either at trial or on appeal, precisely what factual questions would need to be resolved before the court could determine the legal issue of the official's reasonableness. In finding that defendants politically discriminated against plaintiffs, the jury found that defendants intentionally violated plaintiffs' constitutional rights. Thus, it appears that any factual finding the jury could make would not benefit defendants. We find no error.

Defendants also argue that the court erred in failing to grant them qualified immunity. We review de novo the district court's denial of a qualified immunity defense. Suboh, 298 F.3d at 90. Defendants remarkably contest all three prongs of the qualified immunity analysis. We need not long consider the first two prongs. Plaintiffs' allegations, if true, clearly established a violation of their First Amendment rights, and such right was well established at the time of the violation. See Acevedo-García, 351 F.3d at 564. In light of the jury's verdict and our affirmance of it, the third prong is also unavailing. As just mentioned, the jury found that defendants intentionally violated plaintiffs' constitutional rights. Any reasonable official would clearly understand that it is improper to intentionally violate an employee's First Amendment rights. See id. at 564-65. Defendants were not entitled to qualified immunity.

## IV. Excessive Damages

### A. Compensatory Damages

Defendants contend that the compensatory damages award lacked evidentiary support and also that it was excessive. In making these claims, they do not cite any First Circuit precedent. They do cite a Fourth Circuit case, Price v. City of Charlotte, 93 F.3d 1241 (4th Cir. 1996), which they miscite as a First Circuit case, and an unpublished decision from the District of Puerto Rico, Laracuente-Pabón v. Rodríguez, No. 95-1528, 1998 U.S. Dist. Lexis 22430 (D.P.R. Mar. 30, 1998). They also cite three Supreme Court cases for the proposition that actual injury is required for an award of compensatory damages. Further, in making this argument, defendants were obliged to present the facts in the light most favorable to the verdict but failed to do so.[6] See Anthony v. G.M.D. Airline Servs., Inc., 17 F.3d 490, 493 (1st Cir. 1994). Given the defendants' failure to specify the applicable law and their failure to present the facts in the light most favorable to the verdict, this argument is not sufficiently developed and thus

---

[6] Rodríguez testified that as a result of her demotion and transfer to a dangerous, high-security prison, she sought emotional therapy through state insurance. Defendants stated that Rodríguez voluntarily decided to seek state benefits and was not compelled to do so. Escobar testified that as a result of her demotion she was forced to seek psychological help, she needed medication to sleep well, and her credit was harmed. Defendants argue, without any evidentiary support, that Escobar's emotional condition was not the result defendants' actions but caused by her poor credit history and divorce.

-24-

waived.  See Colón v. R.K. Grace & Co., 358 F.3d 1, 5 (1st Cir. 2003).  Even assuming that this argument was sufficiently developed, the jury's award of compensatory damages was amply supported by the record.

**B.  Punitive Damages**

The jury awarded punitive damages of $120,000 to Rodríguez and $195,000 to Escobar.  The punitive damages were assessed against Dávila.  Dávila argues that the punitive damages award was excessive.  We review this claim de novo. Romano v. U-Haul Int'l, 233 F.3d 655, 672 (1st Cir. 2000).  The purpose of punitive damages is to punish and deter reprehensible conduct. Id. A punitive damages award will stand unless we find it "certain that the amount in question exceeds that necessary to punish and deter the alleged misconduct."  Id. (internal quotation marks omitted). The Supreme Court has presented three guideposts to consider in determining the excessiveness of a punitive damages award: "(1) the degree of reprehensibility of a defendant's conduct; (2) the ratio between punitive and actual and potential damages; and (3) a comparison of the punitive damages figure and other civil and criminal penalties imposed for comparable conduct."  Id. at 672-73 (citing BMW of N. Am. v. Gore, 517 U.S. 559, 574-75 (1996)).

The first guidepost is "perhaps the most important" in this determination.  BMW of N. Am., 517 U.S. at 575.  Punitive damages are justified "'when the defendant's conduct is shown to be

-25-

motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Kolstad v. Ada, 527 U.S. 526, 536 (1999) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  We have previously affirmed the award punitive damages to state employees suffering adverse employments actions in violation of their First and Fourteenth Amendment rights.  Acevedo-García, 351 F.3d at 571; Rivera-Torres v. Ortiz Vélez, 341 F.3d 86, 102 (1st Cir. 2003).

Defendants' only argument against punitive damages is that they did not violate plaintiffs' First or Fourteenth Amendment rights.  Since the jury found otherwise and we construe all evidence in favor of the jury's verdict, this argument is to no avail.  The jury found that Dávila intentionally demoted plaintiffs because of their political affiliation.  Dávila's act also jeopardized plaintiffs' livelihood.  As a result of their demotions, Rodríguez's salary was reduced by 60 percent and Escobar's salary was reduced by 43 percent.  Both plaintiffs suffered harms to their professional careers, were unable to meet their financial obligations because of their reduced salaries, and suffered emotional distress for which they sought medical attention.

Dávila addresses only the first guidepost, but the other two guideposts also favor plaintiffs.  In addition to back pay, the jury awarded Rodríguez compensatory damages of $180,000 and Escobar

compensatory damages of $105,000.  Thus, for Rodríguez, the punitive damages were less than the compensatory damages, and for Escobar, the punitive damages were less than twice the compensatory damages.  The ratio of punitive to compensatory damages and the magnitude of the punitive damages are far from extraordinary.  See Rivera-Torres, 341 F.3d at 102 (finding punitive damages "well within acceptable bounds" in a political employment discrimination suit where the jury awarded $185,000 in compensatory damages to the plaintiff, $135,000 in compensatory damages to plaintiff's family, and $250,000 in punitive damages); see also Tapalian v. Tusino, 377 F.3d 1, 8-9 (1st Cir. 2004) (upholding an award $58,843 in compensatory damages and $150,000 in punitive damages); Davis v. Rennie, 264 F.3d 86, 117 (1st Cir. 2001) (awarding punitive damages of about one million dollars, ten times the amount of compensatory damages); Romano, 233 F.3d at 673 (awarding punitive damages nineteen times greater than compensatory damages).

## V.  Conclusion

At the conclusion of the trial, the district court stated "it is incredible that anybody would believe that there was not the slightest political motivation in what happened in this case.  It is just unbelievable.  It is an insult to the intelligence of the human being to think otherwise."  We agree.

**Affirmed**.