PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SCOTT LEWIS RENDELMAN,

*Plaintiff-Appellant,*

v.

NANCY ROUSE, Warden; SCOTT STEININGER, CDRM Correctional Dietary Regional Manager; CAROLYN THOMAS, Food Service Administrator, all defendants individually and in their official capacity,

*Defendants-Appellees.*

No. 08-6150

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:07-cv-00580-JFM)

Argued: March 25, 2009

Decided: June 25, 2009

Before MICHAEL, KING, and AGEE, Circuit Judges.

Dismissed in part and affirmed in part by published opinion. Judge Michael wrote the opinion, in which Judge King and Judge Agee joined.

## COUNSEL

**ARGUED:** Timothy McGinn, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellant. Phillip M. Pickus, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** James E. Coleman, Jr., Sean E. Andrussier, James Healy, Matthew Levy, Susan Pourciau, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellant. Douglas F. Gansler, Attorney General of Maryland, Baltimore, Maryland, for Appellees.

## OPINION

MICHAEL, Circuit Judge:

Scott Rendelman appeals the district court's order granting summary judgment to Maryland Division of Corrections (MDOC) officials on his claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.*, and 42 U.S.C. § 1983. While incarcerated in MDOC, Rendelman brought this action against the Correctional Dietary Regional Manager, the Food Service Administrator, and the Warden at Maryland Correctional Institution – Hagerstown (MCI-H). Rendelman sued all defendants in their official and individual capacities, seeking injunctive relief and damages under RLUIPA and § 1983 based on defendants' refusal to make any accommodation for his kosher dietary restrictions. The district court resolved the action on the merits, holding that Rendelman was not entitled to relief under RLUIPA or § 1983.

Rendelman limits his appeal to the RLUIPA claims. His recent transfer into federal custody, however, has rendered moot his claim for injunctive relief under RLUIPA. With respect to damages, we have held previously that RLUIPA

does not authorize a claim for money damages against an official sued in her official capacity. Today we hold that, when invoked as a spending clause statute, RLUIPA does not authorize a claim for money damages against an official sued in her individual capacity. We therefore affirm the district court's judgment insofar as it rejects Rendelman's claim for damages.

I.

Rendelman is an Orthodox Jew whose religious beliefs require him to abide by kosher dietary laws. On January 18, 2006, Rendelman arrived at MDOC to begin service of his sentence; he was housed temporarily at the Reception Center before being transferred on January 30, 2006, to MCI-H. MDOC offers its inmates a choice of two diets: a pork-free regular diet and a lacto-ovo vegetarian diet. Although the diets are designed "to accommodate a broad spectrum of religious practices," J.A. 30, neither diet complies with the laws of kashrut (the rules derived from the Torah governing the eating of food). As a result, in order for Rendelman to follow the dictates of his religion, he is unable to eat many of the items served on either menu, including any foods cooked at the prison.

Immediately upon his incarceration and prior to his transfer to MCI-H, Rendelman requested that prison authorities make certain accommodations for his religious dietary limitations. He was informed by the chaplain that a kosher diet was unavailable. Following his transfer to MCI-H, Rendelman again requested a kosher diet or reasonable accommodation for his religious requirements. On February 14, 2006, Rendelman sent a handwritten letter to Scott Steininger, the Correctional Dietary Regional Manager, asking to speak to him about his religious dietary needs. Rendelman wrote that the Inmate Handbook he received specifically provided, under the heading "Religious Diets," that "[t]he master menu . . . is designed to accommodate substitutions or alternate food selections, extra portions of acceptable menu items, etc. to

conform to religious diets," and Rendelman inquired as to how this policy worked in practice. J.A. 28. He explained that due to his kosher dietary restrictions he was unable to eat most of the available foods and that "medical" had documented that he had already "lost 23 pounds because there are so few items on the regular tray [he could] eat." *Id.* On the same day Rendelman initiated an administrative grievance process by submitting an informal inmate complaint form. In the complaint Rendelman quoted the same passage from the Inmate Handbook and explained that he had been "repeatedly denied extra portions of items [he could] eat, such as dry cereal" and that he "need[ed] certain items served on paper plates" to comply with his religious dietary restrictions. J.A. 26.

The next day, February 15, 2006, Steininger spoke with Rendelman and "told him that it was his choice not to eat the food [and] that we do not substitute other food." J.A. 27. The staff response to Rendelman's complaint, dated February 16, acknowledged the language in the Inmate Handbook but similarly explained that "we do not substitute[;] it is up to the Inmate whether he wants [the] meal or not." J.A. 26.

Rendelman continued to seek relief through the administrative grievance process. He repeatedly requested that MDOC adhere to the policy stated in the Inmate Handbook and permit him to "assemble a common fare tray from the mainline fare." J.A. 33. He also informed MDOC that "[m]any mainline fare items *are* kosher if served on paper plates." *Id.* He was clear throughout the process that he was "*not* demanding a kosher diet line or that any special food be ordered for him." J.A. 39. In April 2006 Rendelman requested that his complaint be "handled expeditiously" due to the fact that his "health is at risk." J.A. 40. He noted that he weighed 154 pounds at his DOC intake physical but had already lost 30 pounds. In response to Rendelman's concerns about weight loss, Steininger wrote in May 2006 that Rendelman, who weighed 128 pounds, "presently falls within the normal limits for his

height": 125-163 pounds for a person who is 5'8". J.A. 58. Steininger further responded that:

> If he has experienced a great deal of weight loss in a short period of time, I would recommend he be put on a High Calorie diet, though inmate Rendelman's issue has not been a matter of enough calories on the Regular diet, but rather a refusal to eat certain foods on this diet.

*Id.*

Rendelman eventually exhausted his administrative remedies in February 2007, more than a year after the filing of his initial complaint. He then filed this action pro se on March 7, 2007, in the District of Maryland. Rendelman's complaint named as defendants DOC Correctional Dietary Regional Manager Steininger, Food Service Administrator Carolyn Thomas, and MCI-H Warden Nancy Rouse. Rendelman claimed that defendants' failure to make any accommodations for his religious dietary restrictions substantially burdened his religious practices in violation of RLUIPA and § 1983. Defendants were sued in both their official and individual capacities. In his prayer for relief Rendelman sought an order "to make reasonable accommodation for diet of kosher food" and "damages $300 per day" for the "ongoing" violation. J.A. 8.

Defendants filed a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment. Defendants argued, among other things, that Rendelman had failed to state a claim under RLUIPA and § 1983.

The district court granted defendants' motion for summary judgment on the merits, holding that their actions had not violated the First Amendment or RLUIPA and that Rendelman was therefore not entitled to any form of relief. The court relied on *Wilkerson v. Beitzel*, 2005 WL 5280675 (D. Md.

2005), *aff'd*, 184 F. App'x (4th Cir. 2006) (unpublished), in concluding that MDOC was not obligated under RLUIPA to accommodate Rendelman's request for a kosher diet. *See Rendelman v. Rouse*, No. 07-cv-580 (D. Md. Oct. 22, 2007). Rendelman appeals the court's ruling on his RLUIPA claim, and we review that ruling de novo. *Doe v. Kidd*, 501 F.3d 348, 353 (4th Cir. 2007).

## II.

RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
>> (1) is in furtherance of a compelling government interest; and
>>
>> (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a) (2006). The term "government" as used in § 2000cc-1 is defined broadly to include:

> (i) a State, county, municipality, or other governmental entity created under the authority of a State;
>
> (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and
>
> (iii) any other person acting under color of State law[.]

*Id.* § 2000cc-5(4)(A).

The protections of § 2000cc-1(a) apply whenever a "substantial burden is imposed in a program or activity that receives Federal financial assistance" or whenever a "substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." *Id.* § 2000cc-1(b)(1), (2). It is undisputed that Rendelman is in a program receiving federal financial assistance, and he bases the applicability of RLUIPA on this fact.

Rendelman contends in his complaint and on appeal that defendants' refusal to make any accommodation for his religious dietary restrictions imposed a substantial burden on his religious exercise in violation of § 2000cc-1(a) of RLUIPA, and that he is therefore entitled to injunctive and monetary relief. We consider his requests for an injunction and damages separately.

## A.

Defendants argue initially that Rendelman's claim for injunctive relief was mooted by his recent transfer out of MDOC custody. After Rendelman filed his appeal in this case, he was convicted on several counts of mailing threatening communications in violation of 18 U.S.C. § 876(c), and he was thereafter transferred to a federal prison. He is currently serving a sentence of 180 months in federal custody and has appealed his federal conviction and sentence.

Defendants are correct that, as a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there. *See Incumaa v. Ozmint*, 507 F.3d 281, 286-87 (4th Cir. 2007); *see also Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (transfer rendered moot a prisoner's claims for injunctive and declaratory relief, but not claims for damages); *Taylor v. Rogers*, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (same).

Rendelman nevertheless contends that his injunctive relief claim is not moot in this case because it is capable of repetition yet evading review. Rendelman points out that he has an appeal pending in this court challenging his conviction and sentence, and he asserts that he could be returned to MDOC custody if his appeal is successful. To support his argument that his transfer to federal custody may not moot his claim for injunctive relief, Rendelman relies on a single case, *Withers v. Levine*, 615 F.2d 158 (4th Cir. 1980).

The holding in *Withers* is not applicable, however, to Rendelman's situation. In *Withers* an inmate brought a § 1983 action seeking declaratory and injunctive relief based on sexual assaults occurring during his temporary confinement on "idle tier," an initial 60- to 90-day confinement for prisoners pending assignment to a prison job and regular housing. The court reasoned that Withers' claims arising from his residence on idle tier were capable of repetition, explaining that:

> Withers had been twice transferred to [the Maryland House of Corrections (MHC)], and each time became the victim of a sexual assault. He is still in Maryland's prison system, and, since he had been previously considered appropriate for minimum custody housing, he again may be transferred to MHC. Such a retransfer cannot be said to be purely speculative, and, from Withers' point of view, there is a reasonable expectation that he again may be subjected to the same action.

*Id.* at 161. The court further concluded that Withers' claims tended to evade review because the limited duration of a prisoner's residence on idle tier "does not provide sufficient time to litigate the adequacy of measures to provide such prisoners as Withers with reasonable protection." *Id.* Rendelman's case is different. If he were to be returned to MCI-H, he would have sufficient opportunity to re-initiate an action seeking injunctive relief. Thus, even if Rendelman's injunction claim

is capable of repetition, it is unlikely that it would persist in evading judicial review.

Defendants have also brought to our attention a recent decision by the Maryland Department of Public Safety and Correctional Services (of which MDOC is a division) to change its inmate food policies to allow for a religious diet consistent with kosher dietary restrictions. Assuming the change is implemented as planned, the provision of a kosher diet would make it unnecessary for Rendelman to relitigate his claim for injunctive relief even if he were eventually returned to MDOC custody.

For these reasons, we conclude that Rendelman's claim for injunctive relief is moot.

### B.

Although Rendelman's transfer out of MDOC custody mooted his claim for injunctive relief, his complaint also included a claim for damages. We have previously held that even if a plaintiff's injunctive relief claim has been mooted, the action is not moot if the plaintiff may be "entitled to at least nominal damages." *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 n.4 (4th Cir. 2007); *see also Williams*, 952 F.2d at 823; *Taylor*, 781 F.2d at 1048 n.1. Rendelman's action is therefore not moot if we conclude that he may be entitled to at least nominal damages.

Rendelman seeks damages against defendants in both their official and individual capacities. In *Madison v. Virginia*, 474 F.3d 118 (4th Cir. 2006), we held that RLUIPA does not authorize claims for money damages against an official who is sued in her official capacity. Viewing RLUIPA's judicial relief language through the lens of Virginia's assertion of Eleventh Amendment sovereign immunity, we held that "Congress unambiguously conditioned federal funds on a State's consent to suit." *Id.* at 122. However, we further held

that Congress failed to "clearly and unequivocally" indicate that the waiver of sovereign immunity extended to money damages. *Id.* at 122-23. The question of whether an RLUIPA plaintiff may pursue a claim for money damages against a government official in her individual capacity was left unresolved in *Madison*, and also in *Lovelace v. Lee*, 472 F.3d 174, 196 n.7 (4th Cir. 2006), issued the same day as *Madison*.

1.

Defendants contend that, as an exercise of Congress' spending clause authority, RLUIPA cannot authorize damage actions against private individuals who are not themselves recipients of federal funding. For this proposition defendants cite *Pennhurst State School & Hospital v. Halderman*, in which the Supreme Court explained that:

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." . . . Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

451 U.S. 1, 17 (1981). Because we agree with defendants that *Pennhurst*'s clear notice requirement resolves whether defendants in this case may be held liable for damages in their individual capacities, we need not consider defendants' broader assertion that a spending clause statute could in no instance condition a state's acceptance of federal funds on the creation of an individual capacity damages action.[1]

---

[1]The Supreme Court outlined the limitations on Congress' spending clause power in *South Dakota v. Dole*, 483 U.S. 203 (1987). First, "the

Section 2000cc-2 of RLUIPA, entitled "Judicial relief," provides that "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a) (2006). As noted above, the term "government" is defined to include "any . . . person acting under color of State law." *Id.* § 2000cc-5(4)(A)(iii).

Assuming without deciding that Congress could condition a state's acceptance of federal funds on the state subjecting its officials to liability for damages in their individual capacities, we must nevertheless determine whether § 2000cc-2(a) "furnishes clear notice" of a congressional intent to do so in RLUIPA. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Legislation enacted pursuant to Congress' spending power has previously been held to authorize damages actions against state entities receiving federal funds. *See, e.g.*, *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60 (1992) (authorizing damages actions against school districts for intentional violations of Title IX, a spending clause statute); *id.* at 70 (noting that "a clear majority [of the justices in *Guardians Ass'n v. Civil Service Commission of New York City*, 463 U.S. 582 (1983),] expressed the view that damages were available under Title VI [a spending clause statute] in an action seeking remedies for an intentional violation"); *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (holding that "the remedies for violations of . . . § 504 of the Rehabili-

---

exercise of the spending power must be in pursuit of 'the general welfare.'" *Id.* at 207. Second, where Congress seeks to condition the states' receipt of federal funds, it "must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (quoting *Pennhurst*, 451 U.S. at 17). Third, "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" *Dole*, 483 U.S. at 207 (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion)). And finally, "other constitutional provisions may provide an independent bar to the conditional grant of federal funds." *Dole*, 483 U.S. at 208.

tation Act [a spending clause statute] are coextensive with the remedies available in a private cause of action brought under Title VI"). Our research suggests, however, that it would be a novel use of the spending clause to condition the receipt of federal funds on the creation of an *individual capacity* damages action; we can find no instance in which the spending clause has been used in this manner.

When Congress desires to impose a condition under the spending clause, "it is Congress' burden to 'affirmatively impos[e]' [the] 'condition in clear and unmistakable statutory terms.'" *Madison*, 474 F.3d at 125 (quoting *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 563 (4th Cir. 1997) (en banc) (second alteration added)). We conclude therefore that in simply defining "government" in § 2000cc-2 to include a "person acting under color of State law," Congress did not signal with sufficient clarity an intent to subject such a person to an individual capacity damages claim under RLUIPA. *See Pennhurst*, 451 U.S. at 17; *Madison*, 474 F.3d at 125 ("States cannot, of course, knowingly accept conditions of which they are unaware or cannot reasonably ascertain."). Hence, Rendelman cannot rely on RLUIPA's spending clause basis to pursue his claim for individual capacity damages.

2.

RLUIPA also purports to have an independent commerce clause basis. *See* 42 U.S.C. § 2000cc-1(b) (RLUIPA applies whenever "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes"). In this case, however, Rendelman has claimed RLUIPA jurisdiction exclusively under § 2000cc-1(b)(1), explaining in his complaint that "[M]DOC receives federal funds." J.A. 8. He did not advance any claim that the substantial burden on his religious exercise caused by the denial of accommodations for his kosher dietary requirements would "affect . . . commerce with foreign nations, among the several States, or with Indian

tribes." 42 U.S.C. § 2000cc-1(b)(2). Consequently, the independent commerce clause basis for RLUIPA is not properly before the court on this appeal, and we need not resolve whether the statute, analyzed under the commerce clause, would authorize individual capacity damages actions.

### III.

In sum, Rendelman's appeal of his claim for injunctive relief is dismissed as moot due to his transfer into federal custody. The district court's summary judgment in favor of defendants is affirmed insofar as it rejects Rendelman's claim for damages.[2]

*DISMISSED IN PART*
*AND AFFIRMED IN PART*

---

[2]Because RLUIPA does not authorize claims for official or individual capacity damages, we have no need to evaluate the district court's determination that RLUIPA did not require defendants to accommodate Rendelman's kosher dietary restrictions.