# United States Court of Appeals

## For the First Circuit

No. 10-2083

ALBERT KUPERMAN,

Plaintiff, Appellant,

v.

WILLIAM L. WRENN, Commissioner, New Hampshire Department of
Corrections; RICHARD M. GERRY, Warden, New Hampshire State
Prison; MICHAEL A. SAMSON; STEVEN E. BRITTON,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

Nancy S. Tierney, and the Law Office of Nancy S. Tierney, on
brief for appellant.
Laura E. B. Lombardi, Assistant Attorney General, and Michael
A. Delaney, Attorney General, on brief for appellees.

July 14, 2011

**THOMPSON, Circuit Judge.** Albert Kuperman, a former inmate at the New Hampshire State Prison, challenges a district court order granting summary judgment to the defendant prison officials. The New Hampshire State Prison system requires all inmates to be clean-shaven, unless they obtain a waiver based on a medical condition or on their religious beliefs.[1] An inmate who obtains a shaving waiver based on his religious beliefs may "maintain a 1/4-inch neatly trimmed beard."

While incarcerated in state prison, Kuperman, an Orthodox Jew, filed a *pro se* complaint claiming that he should not have been required to shave at all, because doing so unduly impinged on his sincerely-held religious beliefs. More specifically, he asserted a claim under 42 U.S.C. § 1983, alleging that the prison shaving regulation (sometimes referred to as "PPD 7.17") violated his rights under the First Amendment's Free Exercise Clause and the

---

[1] The section of the New Hampshire Department of Corrections Policy and Procedure Directive 7.17 which addresses religious waivers, section IV.D., states as follows:
> Shaving Waivers: Inmates declaring membership in recognized faith groups, and demonstrating a sincerely held religious belief in which the growing of facial hair is of religious significance may request a shaving waiver. If approved, the shaving waiver allows an inmate to maintain a 1/4-inch neatly trimmed beard. No sculpting, shaping or selective shaving is allowed; all facial hair must be trimmed equally. If an inmate with a shaving waiver is found to have shaped his beard, he must shave clean and start again. Abuse of the shaving waiver guidelines may result in revocation of the shaving waiver. Violations of the shaving waiver will be reported to the appropriate Unit Manager who will determine what action will be taken.

Fourteenth Amendment's Equal Protection Clause.  He also argued that it violated the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc-1 *et seq.*[2] The complaint sought injunctive relief, monetary damages, and declaratory judgment.

The defendants are William Wrenn, Commissioner of the New Hampshire Department of Corrections, and Richard Gerry, Warden of the New Hampshire State Prison (collectively referred to as "Prison Officials").  Kuperman sued them in both their official and personal capacities.  During preliminary screening of the complaint, the district court identified which claims could proceed.[3]  As part of that screening, it dismissed Kuperman's official capacity claims except to the extent they sought

---

[2]    Kuperman originally asserted some additional claims, but they will not be discussed because they were dismissed or withdrawn before this appeal was filed.

[3]    Preliminary screening was required by 28 U.S.C. § 1915A, which provides in relevant part as follows:
   (a) Screening.—The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
   (b) Grounds for Dismissal.—On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—
       (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
       (2) seeks monetary relief from a defendant who is immune from such relief.

-3-

injunctive relief. Kuperman does not challenge that dismissal on appeal.

Prison Officials filed a motion seeking summary judgment on all remaining claims. Kuperman, who by this stage had obtained counsel, opposed the motion, but submitted no new affidavits or other admissible evidence to rebut Prison Officials' arguments.[4] Ultimately, the district court granted summary judgment in favor of Prison Officials on all claims. Kuperman filed a timely notice of appeal.

Because our review of the record reveals no dispute of material fact and shows that Prison Officials are entitled to judgment as a matter of law, we affirm the judgment of the district court.

---

[4] Kuperman's summary judgment opposition included a single-page document which appears to be minutes of an Inmate Communications Committee meeting held on June 16, 2010. Kuperman failed to make any showing as to grounds under which the document could be admitted as evidence. See Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 475-76 (1st Cir. 2002). Even overlooking that problem, however, the content of the document (including its reference to a discussion about a "proposal on the elimination of the current shaving policy" and a comment allegedly made by a prison Health Services representative that "things would be a lot easier . . . if this policy were to be discontinued") is insufficient to create a dispute of material fact, when viewed in the context of the overall record. An affidavit submitted by Prison Officials explained that they were considering whether to change the shaving policy to permit all inmates to maintain a 1/4-inch neatly trimmed beard, without having to obtain a shaving waiver.

**MOTION TO DISMISS**

Because Kuperman completed his sentence and was released from state custody while his appeal was pending, Prison Officials moved to dismiss his claims for injunctive and declaratory relief as moot. Kuperman agrees that his claims for injunctive relief are moot. But he insists that his claims for declaratory relief and monetary damages survive. We can decide only ongoing cases and controversies, of course. See U.S. Const. art. III, § 2, cl. 1; Preiser v. Newkirk, 422 U.S. 395, 401 (1975). So if an event occurs that makes it impossible for us to provide some form of meaningful relief, there is, generally speaking, no case or controversy, and we must dismiss the appeal as moot. See, e.g., Church of Scientology v. United States, 506 U.S. 9, 12 (1992). Our first task, then, is to see whether Kuperman's release from prison eliminates any possibility of further judicial relief, which would render his claims moot.

## Official Capacity Claims

During preliminary screening of Kuperman's complaint, the district court jettisoned his official capacity claims except to the extent they sought injunctive relief — a ruling Kuperman does not contest here. Kuperman concedes that his release moots his injunctive relief requests. See, e.g., Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009). That leaves us with this: § 1983

and RLUIPA claims against Prison Officials in their personal capacities seeking monetary and declaratory relief.

## Personal Capacity Claims

A claim is moot only if no relief is available. See Church of Scientology, 506 U.S. at 12. Prison Officials appear to concede that Kuperman's claims for monetary relief survive, given that their motion to dismiss mentions Kuperman's request for monetary relief but asks us to dismiss only his claims for injunctive and declaratory relief. Indeed, as a former prisoner alleging a constitutional violation that occurred during his incarceration, Kuperman may obtain nominal and punitive damages under § 1983.[5] See, e.g., Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004); Thompson v. Carter, 284 F.3d 411, 416 (2d Cir. 2002); Searles v. Van Bebber, 251 F.3d 869, 879, 881 (10th Cir. 2001). Because some relief is available on Kuperman's claims, they are not

_____

[5]     Although neither party discussed the Prison Litigation Reform Act, we note that it could preclude Kuperman from recovering on his § 1983 claim seeking compensatory damages. See 42 U.S.C. § 1997e(e). Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Although some courts have interpreted section 1997e(e)'s limitation not to apply to constitutional claims, see generally Thompson v. Carter, 284 F.3d 411, 416-17 (2d Cir. 2002) (collecting cases), we need not reach the issue. It does not matter whether compensatory damages are available to Kuperman, because his requests for nominal and punitive damages are enough to keep his claims alive.

-6-

moot.[6]  See Powell v. McCormack, 395 U.S. 486, 496 n.8 (1969); Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd., 633 F.3d 20, 36 (1st Cir. 2011) (citing Church of Scientology, 506 U.S. at 13).

For the same reason, Prison Officials' argument that Kuperman is no longer entitled to declaratory relief is beside the point.  Our question is whether Kuperman can obtain some relief, and he can.  Therefore, his claims are not moot.

We grant Prison Officials' motion to dismiss Kuperman's claims seeking injunctive relief, and analyze his remaining claims on the merits.

## STANDARD OF REVIEW

We review orders granting summary judgment *de novo*, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the nonmoving party.  Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 37 (1st Cir. 2007) (citing Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).  Summary judgment is proper if there is no genuine issue as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law.  Id.

---

[6]    As discussed in more detail *infra*, we reserve ruling on the issue of whether personal-capacity claims are available under RLUIPA.  See Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 8-9 (1978) (expressing no opinion on the validity of respondents' claim for actual and punitive damages, but noting that the request saved the claim from mootness because it "is not so insubstantial or so clearly foreclosed by prior decisions that this case may not proceed").

-7-

**MERITS**

As the moving parties, Prison Officials had the initial burden of informing the judge of the basis for their motion and identifying the portions of the record that demonstrate the absence of any genuine issue of material fact. See Rivera-Colón v. Mills, 635 F.3d 9, 12 (1st Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)). If they did that, then Kuperman had to show, "through submissions of evidentiary quality, that a trialworthy issue persists." Iverson, 452 F.3d at 98. On issues for which Kuperman would bear the burden of proof at trial, he had to introduce definite, competent evidence to survive summary judgment. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).

### First Amendment[7]

Section 1983 provides a cause of action against those who, acting under color of state law, violate federal law. 42 U.S.C. § 1983; see also Rodríquez-Cirilo v. García, 115 F.3d 50, 52 (1st Cir. 1997). Kuperman's § 1983 claim is based in part on his contention that the prison shaving regulation prevented him from

---

[7] Kuperman's First Amendment claim proceeded against both Prison Officials, Wrenn and Gerry. Because our analysis does not require us to differentiate each defendant's role, we continue to refer to them collectively.

practicing his religion, in violation of the First Amendment's Free Exercise Clause.[8]

A prison regulation which restricts an inmate's First Amendment rights is permissible if it is "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). The factors relevant in deciding the regulation's constitutionality are: (1) whether there is a valid, rational connection between the regulation and the legitimate government interest put forward to justify it; (2) whether alternative means to exercise the right exist; (3) the impact that accommodating the right will have on prison resources; and (4) the absence of alternatives to the prison regulation. Id. at 89-90. We will refer to these as the "Turner factors." Of course, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003); see also Brown v. Plata, 131 S. Ct. 1910, 1928 (2011). When contesting the reasonableness of a prison's regulation, the inmate bears the burden of persuasion. See Overton, 539 U.S. at 132.

---

[8] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

-9-

Applying the first <u>Turner</u> factor, we consider whether the beard-length restriction is reasonably related to the penological interests asserted by Prison Officials to justify it. See <u>Turner</u>, 482 U.S. at 89-90. Prison Officials submitted an affidavit from Charles Boyajian, Unit Manager of the Special Housing Unit and the Close Custody Unit of the New Hampshire State Prison for Men, stating that the shaving regulation promotes safety and security interests and good hygiene.[9] Prison Officials insist that the beard-length restriction is reasonably related to prison security because it (1) helps guards identify inmates inside the prison to ensure they do not enter prohibited areas, (2) makes it harder for inmates to hide weapons or contraband, and (3) prevents an inmate from quickly changing his appearance if he escapes.

Kuperman's evidence does not refute these contentions. On appeal, he contends otherwise, pointing to a letter from Rabbi Wiener of the Jewish Council of Greater Coney Island, and an affidavit from another inmate, Wayne Sargent. Rabbi Wiener's letter, which was attached to the complaint and not sworn to under oath, establishes that wearing a full, untrimmed beard is important in Jewish law. Yet it says nothing which casts doubt on Prison

---

[9] There is very little evidence in the record supporting Prison Officials' contention that the shaving regulation promotes inmate hygiene. But we need not reach this question because we conclude *infra* that the regulation is reasonably related to the legitimate penological interest of prison security. Although Prison Officials refer to the interest asserted as "safety and security," we prefer the more concise term "prison security."

-10-

Officials' contention that the shaving regulation promotes prison security.[10]  The other document Kuperman relied on, the Sargent affidavit, indicates that some inmates were allowed to grow beards longer than 1/4-inch in length, but contains nothing which could be used to rebut Prison Officials' assertion that the shaving regulation promotes important penological interests.

Finishing up the first Turner factor, we briefly dispatch a couple of Kuperman's non-starters.  He argues that even if he had been allowed to grow a longer beard, he personally would not have posed a security risk.  But courts do not require an actual breach of security before upholding a regulation designed to prevent it.  See, e.g., Turner, 482 U.S. at 89; O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987).  And his contention that Prison Officials failed to meet their burden because they did not produce studies or independent expert testimony showing that this particular regulation promotes prison security overstates their burden.  See Beard v. Banks, 548 U.S. 521, 531-32 (2006) (statements of prison official to the effect that the regulation serves the function identified were sufficient when the articulated connections between the regulation and the penological objective are "logical ones").  Based on Prison Officials' explanation of the rationale for the

---

[10]    As was true of the document attached to Kuperman's summary judgment opposition, Kuperman failed to make any showing as to grounds under which the letter could be admitted as evidence.  See Gorski, 290 F.3d at 475-76.

-11-

shaving regulation, we conclude that they met their burden of demonstrating that it is reasonably related to the legitimate penological interest of maintaining prison security.

Proceeding to the second Turner factor, we look at whether alternative means for exercising the inmate's constitutionally-protected right remain open to him. Turner, 482 U.S. at 90. Kuperman contends that because shaving is an act of sacrilege to a member of the Orthodox Jewish faith, there were no alternative means available to him. His argument misses the mark. Our inquiry is not into whether a religiously-acceptable alternative to growing a full beard existed. Instead, we consider whether alternative means remained open for Kuperman to exercise the constitutionally-protected right at issue — here, free exercise of his religion. See O'Lone, 482 U.S. at 351-52 (inmates were not deprived of "all forms of religious exercise"); Turner, 482 U.S. at 92 (correspondence regulation did not deprive prisoners of "all means of expression"); Freeman v. Tex. Dep't of Criminal Justice, 369 F.3d 854, 861 (5th Cir. 2004) ("The pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith."); Green v. Polunsky, 229 F.3d 486, 489 n.15 (5th Cir. 2000) (citing O'Lone, 482 U.S. at 352) ("[W]e look to whether inmates are allowed other means to express their religious beliefs (on a general level) *not

-12-

whether they were allowed a means to express their specific religious belief in the necessity of wearing a beard.").

Although the record is sparse on this point, PPD 7.17 itself states that "[a]ll inmates shall have access to religious resources, services, instruction or counseling on a voluntary basis. . . . The institutions will provide all inmates with the opportunity to pursue any recognized belief or practice, subject to the restrictions of their custody level" and "[t]he institution shall extend to all inmates the greatest amount of freedom and opportunity to pursue any recognized religious belief or practice." It includes specific procedures by which inmates could have access to religious publications, religious diets, religious apparel, and personal and group religious items.  Kuperman has introduced nothing indicating that, other than the shaving regulation, the prison interfered with the free exercise of his religious beliefs. Accordingly, we find the record sufficient to demonstrate that Kuperman had available to him alternative means to exercise his right to free expression of his religion.

We move on to the third Turner factor — the impact on guards, other inmates, and the allocation of prison resources generally if the asserted constitutional right were to be accommodated.  See Turner, 482 U.S. at 90.  In other words, we consider how allowing some inmates to grow full beards would affect the prison.  The Boyajian affidavit touches on this issue,

-13-

explaining that because longer beards create opportunities for inmates to transport contraband or weapons, staff would be required to conduct more frequent searches of inmates, which would increase conflicts between staff and inmates and place staff at greater risk of assault. It also states that a more liberal grooming policy would make identifying prisoners more expensive and burdensome because it is "impractical and a strain on prison resources to issue multiple identification cards for every inmate for every possible length or shape of beard."

Kuperman's response is that permitting full beards would have only a nominal effect on prison resources. The only document he references in support of this contention is a magistrate judge's report and recommendation from a completely different case brought by Kuperman concerning suspension of his kosher diet while in prison. Kuperman claims that because only a small number of inmates requested kosher meals, only a small number of prisoners would choose to grow full beards. The report and recommendation actually says nothing about how many other prisoners sought kosher meals. We need not credit conclusory statements made without support in the record. See Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009). Kuperman also fails to address the additional burden which non-uniform rules place on prison staff. Based on the record before us, the third Turner factor weighs in favor of Prison Officials, who have shown that accommodating

Kuperman's desire to grow a full beard would have adversely impacted prison resources.

This brings us to the final Turner factor, whether there were "ready alternatives" to the challenged regulation. See Turner, 482 U.S. at 90. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id. Kuperman suggests that instead of requiring inmates to shave, Prison Officials could have required inmates with full beards to search their own beards in the presence of correctional officers, or staff could have used combs during beard searches. He also proposed that prisons use technology to digitally alter photographs of an escaped inmate to show him without a beard.

The Boyajian affidavit demonstrates that Prison Officials considered and rejected alternatives to PPD 7.17. It says that "[c]onducting 'beard searches' or issuing multiple identification cards showing an inmate with or without a beard are not reasonable or feasible alternatives to the shaving policy" because they would unduly strain prison resources and relations between staff and inmates, and because multiple identification cards would make it difficult to identify inmates quickly. Although the statements in the record are bare-boned, Prison Officials are not required to "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." See Turner, 482 U.S. at 90-91. Rather, we look to "whether the

-15-

prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." Overton, 539 U.S. at 136. Kuperman has not done so, and so we find there were no ready alternatives to the regulation at issue here.

Having found that all four of the Turner factors weigh in favor of Prison Officials, we hold that Prison Officials are entitled to summary judgment on Kuperman's First Amendment claim. Other courts considering prison grooming regulations have reached similar conclusions. See, e.g., Fegans v. Norris, 537 F.3d 897, 906-07 (8th Cir. 2008) (regulation prohibiting beards did not violate First Amendment); McRae v. Johnson, 261 F. App'x 554, 558 (4th Cir. 2008) (unpublished decision) (same); Pollock v. Marshall, 845 F.2d 656, 659-60 (6th Cir. 1988) (regulation restricting inmates' hair length did not violate First Amendment); Oakes v. Green, Civil Action No. 08-CV-12-HRW, 2008 WL 559683, at *4 (E.D. Ky. Feb. 27, 2008) (unpublished decision) (regulation prohibiting beards did not violate First Amendment); Daker v. Wetherington, 469 F. Supp. 2d 1231, 1237, 1239 (N.D. Ga. 2007) (same).[11]

---

[11] We cite unpublished decisions with the recognition that they are persuasive authority but are not binding within their respective jurisdictions. See Fed. R. App. P. 32.1(a).

<u>**Fourteenth Amendment**</u>[12]

In Kuperman's second § 1983 claim, he argues that forcing him to limit the length of his beard violated the Fourteenth Amendment's Equal Protection Clause.[13] Essentially, he contends that Gerry allowed inmates in more secure units to grow longer beards while restricting inmates in the general population to 1/4-inch beards, and that this unequal treatment was not rationally related to a legitimate penological interest. As did his earlier contentions, this one falls short given the record before us.

Equal protection means that "similarly situated persons are to receive substantially similar treatment from their government." <u>Tapalian</u> v. <u>Tusino</u>, 377 F.3d 1, 5 (1st Cir. 2004) (citing <u>Barrington Cove Ltd. P'ship</u> v. <u>R.I. Hous. & Mortg. Fin. Corp.</u>, 246 F.3d 1, 7 (1st Cir. 2001)). To establish an equal protection violation, a plaintiff must introduce sufficient evidence from which a jury reasonably could conclude that, compared with others similarly situated, the plaintiff was treated differently because of an improper consideration, such as his religion. <u>See</u> <u>id.</u> Equal protection does not, however, require prison staff to treat all inmate groups the same when

---

[12] Kuperman's Fourteenth Amendment claim proceeded against only Warden Gerry.

[13] The Fourteenth Amendment provides that states shall not "deny to any person . . . the equal protection of the laws." U.S. Const. art. XIV, § 1.

-17-

differentiation is necessary to avoid a threat to prison security. See, e.g., Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 136 (1977).

The Boyajian affidavit and an affidavit submitted by Lieutenant Paul Cascio, Lieutenant of Security for the Secure Psychiatric Unit and the Residential Treatment Unit of the New Hampshire State Prison, show that the shaving policy applied to all inmates, regardless of where in the prison they resided. Prisoners in the general population who did not have shaving waivers were required to be clean-shaven on Mondays, Wednesdays, and Fridays. Inmates in some high-security units — who were not permitted to have razors — were shaved by barbers once each week or shaved using clippers once every two weeks under staff supervision. Although the shaving policy was implemented differently in different areas of the prison, Gerry articulated a rational basis for allowing inmates in high-security units to go a week or two between shaves — the dangers arising from letting them personally possess razors and the lack of resources necessary to shave them more frequently.

Kuperman contends on appeal that the Sargent affidavit created a dispute of material fact on his equal protection claim. The affidavit states that while Sargent was an inmate in the New Hampshire State Prison, he was at one point permitted to grow his beard to three inches long; that at another time in another unit he was permitted to grow his beard to about two inches long; that in

another prison he "often" had his beard up to one inch long; that he saw one inmate living in the general population with a beard longer than three inches; and that he saw other inmates in a high-security unit with full beards which appeared to be longer than three inches. Construing the evidence in the light most favorable to Kuperman, as we must at this stage, the Sargent affidavit suggests Gerry selectively enforced the shaving regulation.

To affect the summary judgment motion on his equal protection claim, however, Kuperman needed to fortify his selective-enforcement claim with evidence showing that Gerry enforced the shaving regulation against him because of his religion. See Tapalian, 377 F.3d at 5. The record before us is devoid of any such evidence. Because Kuperman failed to show that, based on his religion, he was treated differently from other similarly situated inmates with regard to shaving, Gerry is entitled to summary judgment on Kuperman's equal protection claim.[14]

### RLUIPA Claim

As a preliminary matter, we note that some other circuits have held that personal-capacity claims are unavailable under

---

[14] Kuperman also contends on appeal that the prison's procedures for implementing its shaving policy are deficient. Although these contentions sound like an attempt to mount a procedural due process challenge to the shaving regulation, Kuperman failed to raise such a claim in his complaint or anywhere in the record before the district court. We will not consider it for the first time on appeal. See Aguilar v. U.S. Immigration & Customs Enforcement Div. of Dep't of Homeland Sec., 510 F.3d 1, 12 (1st Cir. 2007).

RLUIPA.  See, e.g, Nelson v. Miller, 570 F.3d 868, 889 (7th Cir. 2009); Rendelman, 569 F.3d at 184; Sossamon v. Texas (Sossamon I), 560 F.3d 316, 329 (5th Cir. 2009), aff'd on other grounds, Sossamon v. Texas (Sossamon II), 131 S. Ct. 1651, 1663 (2011); Smith v. Allen, 502 F.3d 1255, 1275 & n.11 (11th Cir. 2007).  They reason that because Congress passed RLUIPA under the Spending Clause, courts should not interpret it to impose liability on individuals who do not themselves receive federal funds.[15]  See Nelson, 570 F.3d at 886-88; Smith, 502 F.3d at 1273-75; see also U.S. Const. art. I, § 8, cl. 1.  We explain briefly.

The Spending Clause permits Congress to attach conditions designed to promote its policy objectives on the receipt of federal funds.  See South Dakota v. Dole, 483 U.S. 203, 206 (1987).  Spending Clause legislation has been described as creating a "contract" between the federal government and the recipient of federal funds.  See, e.g., Sossamon II, 131 S. Ct. at 1661 (acknowledging the contract-law analogy).

> [C]ourts have consistently recognized the limited reach of Congress' Spending Power legislation, concluding that statutes passed under the Spending Clause may, as a condition of funding, subject the grant *recipient* to liability in a private cause of action, but that the Spending Power cannot be used to subject individual defendants, such as state employees, to individual liability in a private cause of action.

---

[15]    We note that RLUIPA was also enacted pursuant to Congress's Commerce Clause authority.  Sossamon II, 131 S. Ct. at 1656; see also 42 U.S.C. § 2000cc-1(b)(2).

-20-

<u>Smith</u>, 502 F.3d at 1274 (citing Title IX cases).  These courts have concluded that because RLUIPA liability arises from receipt of federal funds, only the grant recipient — the state — may be held liable for a violation of RLUIPA.  <u>See</u> <u>Sossamon I</u>, 560 F.3d at 328 (citing <u>Smith</u>, 502 F.3d at 1272-73); <u>see</u> <u>also</u> 42 U.S.C. § 2000cc-1(b).

Prison Officials have not challenged the viability of Kuperman's personal-capacity claim, and we need not reach the issue.  As we explain in the next section, even assuming such a claim to be available, Kuperman is not entitled to relief under RLUIPA.  We therefore reserve ruling on whether personal-capacity claims are available under RLUIPA, as have our sister courts in the Second and Ninth Circuits.  <u>See</u> <u>Hall</u> v. <u>Ekpe</u>, No. 09-4492-pr, 2011 WL 2600514, at *1 (2d Cir. 2011); <u>Florer</u> v. <u>Congregation Pidyon Shevuyim, N.A.</u>, 639 F.3d 916, 922 n.3 (9th Cir. 2011).

RLUIPA provides greater protection to inmates' free-exercise rights than does the First Amendment.  <u>See</u>, <u>e.g.</u>, <u>Spratt</u>, 482 F.3d at 42 n.12.  It bars prisons receiving federal funds from substantially burdening an inmate's religious exercise unless the regulation under attack is the least restrictive way to advance a compelling state interest.  <u>See</u>, <u>e.g.</u>, <u>Cutter</u> v. <u>Wilkinson</u>, 544 U.S. 709, 715-16 (2005).  Prison Officials conceded, for summary judgment purposes only, that the shaving regulation substantially burdened Kuperman's religious exercise.  So the battle is over

-21-

whether they showed that PPD 7.17 furthers a compelling governmental interest and whether it was the least restrictive means of doing so.

In our discussion of Kuperman's § 1983 claims, we noted that Prison Officials submitted evidence showing that the shaving regulation promotes prison security in several specific ways. Because prison security is undoubtedly a compelling state interest, we conclude that they have met their burden of demonstrating that PPD 7.17 furthers a compelling governmental interest. See, e.g., Spratt, 482 F.3d at 39 (citing Cutter, 544 U.S. at 725 n.13); Fegans, 537 F.3d at 906.

But to survive challenge under RLUIPA, Prison Officials must also show that the shaving regulation was the least restrictive means available to further that interest. See Spratt, 482 F.3d at 40-41. They rely on the Boyajian affidavit to satisfy that requirement. Because most of its key passages have already been quoted in our First Amendment analysis, we refrain from quoting them again here. Boyajian specifically addressed concerns about longer beards being used to conceal weapons and contraband and about additional time and risk to staff if beard searches were required. He explained that issuing multiple identification cards would be too complicated given all of the different possible types of beards and the need for staff to be able to quickly identify

inmates. And he mentioned the risk that escaped inmates with longer beards could more quickly change their appearance.

We further note that the shaving regulation allowed inmates whose religious beliefs value growing facial hair to maintain 1/4-inch beards, which is less restrictive than enacting a regulation prohibiting beards altogether, as some other prisons have done. Compare PPD 7.17 with Gooden v. Crain, 353 F. App'x 885, 886-87, 890 (5th Cir. 2009)(unpublished decision)(upholding regulation prohibiting beards unless inmate obtains a medical exception) and Fegans, 537 F.3d at 901, 907 (same).

Kuperman contends that the shaving regulation was not the least restrictive means available to Prison Officials, but he submitted no admissible evidence to counterbalance Prison Officials' affidavits. Because the unrebutted Prison Officials' affidavits show that they considered and rejected alternatives to the shaving regulation, we find that it meets RLUIPA's least restrictive means test.

Accordingly, assuming for argument's sake that Kuperman can assert a personal-capacity claim under RLUIPA, Prison Officials are entitled to summary judgment on his RLUIPA claim. Once again, our conclusion is consistent with that reached by other courts considering even more restrictive regulations. See Gooden, 353 F. App'x at 886-87, 890 (regulation prohibiting beards did not violate RLUIPA); Fegans, 537 F.3d at 901, 907 (same); McRae, 261 F. App'x

at 558 (same); Oakes, 2008 WL 559683, at *4 (same); Daker, 469 F. Supp. 2d at 1237 (same). But see Mayweathers v. Terhune, 328 F. Supp. 2d 1086, 1096 (E.D. Cal. 2004) (regulation prohibiting beards violated RLUIPA); Gartrell v. Ashcroft, 191 F. Supp. 2d 23, 36 (D.D.C. 2002) (regulation prohibiting beards violated the Religious Freedom Restoration Act, the predecessor to RLUIPA).

## CONCLUSION

For the reasons recited above, we grant Prison Officials' motion to dismiss Kuperman's claims seeking injunctive relief. We **<u>affirm</u>** the judgment below granting summary judgment in favor of Prison Officials on Kuperman's remaining claims. No costs to either party.