# United States Court of Appeals
## For the First Circuit

No. 11-1634

SETH BADER,

Plaintiff, Appellant,

v.

WILLIAM L. WRENN, COMMISSIONER,
NEW HAMPSHIRE DEPARTMENT OF CORRECTIONS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Torruella, Boudin and Lipez,

Circuit Judges.

Michael J. Sheehan for appellant.
Laura E. B. Lombardi, Assistant Attorney General, Civil
Bureau,  with whom Michael A. Delaney, Attorney General, was on
brief for appellee.

March 29, 2012

**BOUDIN**, <u>Circuit Judge</u>.  Seth Bader, an inmate serving a life sentence for murder without the possibility of parole, is currently held at New Hampshire's Northern Correctional Facility located in Berlin, New Hampshire ("NCF-Berlin").  Transferred there from the New Hampshire State Prison in Concord ("NHSP-Concord"), he sued unsuccessfully under the Religious Land Use and Institutionalized Persons Act  ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., seeking a transfer back to NHSP-Concord.  The papers and district court hearing reveal the following.

Before he was transferred to NCF-Berlin in December 2010, Bader--an Orthodox Jew--was confined for 12 years at NHSP-Concord and regularly participated in Jewish religious activities. He attended Sabbath services in the prison roughly twice a month, which included prayers, blessings, and the lighting of candles meant to be performed in a group setting.  The regular group participating the Sabbath celebration included at least three inmates as well as an outside volunteer.  New Hampshire prison regulations require group worship services to be led by the prison chaplain or an approved outside volunteer.

At NHSP-Concord, Bader also regularly participated in the group celebration of Jewish holidays, including Passover, Purim, Yom Kippur, Rosh Hashanah and Chanukah.  A local rabbi would attend many of these holiday celebrations each year to help ensure that they were properly celebrated and to assist with the rituals.

Aside from these regular group celebrations, Bader also followed dietary restrictions and met individually with a rabbi who visited the prison on a regular basis. The rabbi helped Bader pray with the proper accouterments,[1] and also provided counsel and assistance regarding personal and family matters.

On November 26, 2010, Major John Fouts, who serves as the director of security at NHSP-Concord, directed a search of the workplace facilities at the prison where Bader was assigned. At Bader's workstation, officers found classical music CDs and a floppy disk that Major Fouts believed to be for personal use. Bader was "written up" for a disciplinary violation--later dismissed when it was determined that all of the alleged contraband was given to Bader by staff or was in his possession with their approval.

Nevertheless, with the agreement of the warden, Bader was transferred to NCF-Berlin about a week after the incident. Major Fouts testified that Bader was not transferred because of this charge alone, but because Fouts' investigation uncovered "indications that [Bader] had undue influence in other areas of the prison." Fouts said he was concerned, for example, that Bader was

---

[1]The Tefillin, also called phylacteries, are a set of boxes containing sacred texts inscribed on parchment that Jews may strap to their body as part of morning prayer. Rabbi Krinsky, the rabbi who has visited Bader in prison, testified that the placement of these articles is quite difficult and that he regularly assists members of his congregation with the placement.

accessing material from other parts of the workplace in an inappropriate way, was using the prison's educational facilities beyond what was required and was developing relationships with staff that Bader might exploit later.

At NCF-Berlin, Bader asked the prison chaplain about Jewish services and was told that none were currently offered, as none had been requested. The chaplain then made efforts, largely fruitless, to locate outside volunteers to lead such services. Prior to Bader's lawsuit, which he began several months after his transfer to NCF-Berlin, he had not met with a rabbi or any other volunteer; he had not celebrated any Sabbath services; and with no rabbinical visits, his ability to pray with the Tefillin was curtailed.

Bader acknowledges that between the February 2011 hearing held before the magistrate judge and the filing of his brief on appeal in September 2011, a Jewish cantor apparently conducted an "abbreviated" Seder service at Passover and two rabbinical students met with Bader and another inmate for 15 or 20 minutes in August 2011. But, as of the time of the lawsuit, only one other practicing Jewish inmate was housed at NCF-Berlin, thereby depriving Bader of a congregation with whom to worship.[2]

---

[2]The rabbi who testified for Bader at the hearing, when asked whether group worship was important for faith reasons, responded that a quorum of ten was important for certain prayers, and continued, "I don't know if it matters if it's five or seven or . . . four or three, but certainly just doing it with many

-4-

NCF-Berlin is located in the less populated northern part of the state, resulting in a lack of volunteers willing to visit both to conduct services and to minister to Bader personally. Berlin is about two hours' drive north from Concord. Rabbi Krinsky and one of two regular volunteers at NHSP-Concord testified at the hearing that they were unable to travel to Berlin to lead services or otherwise minister to Bader because of the travel required.

Bader brought suit under RLUIPA against William Wrenn, Commissioner of the New Hampshire Department of Corrections, challenging his transfer; he sought preliminary and permanent injunctive relief requiring his return to NHSP-Concord, as well as attorneys' fees and costs under 42 U.S.C. § 1988(b). RLUIPA provides in pertinent part that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

After the preliminary injunction hearing, which adduced the evidence already described, the magistrate judge recommended

---

voices."

that the injunction be denied. Centrally, the magistrate judge concluded that

> "[t]he government action in transferring Bader to [NCF-Berlin] did not prevent him from receiving [religious] services. The volunteers themselves have been unable to travel to [NCF-Berlin] . . . . [T]hat failure of volunteers to appear, as long as their visits are not prohibited by an action of the government, does not give rise to a RLUIPA claim."

Bader v. Wrenn, No. 11-cv-043, at 45 (D.N.H. Mar. 14, 2011).[3]

Bader filed a motion to re-open in order to contest the report's recitation of Major Fouts' testimony on the subject of his transfer. Bader said that he relied upon the magistrate judge's representation that she would not make findings based upon the surprise (and in part hearsay) testimony of Major Fouts. Bader sought to call four witnesses in order to rebut the testimony; but, in a second report, the magistrate judge made clear that her recommendation did not depend on any finding that Bader constituted a security risk so the justification vel non for the transfer was beside the point.

The district court accepted the magistrate judge's recommendation and denied Bader's motion for a preliminary

---

[3]In the recommended findings, the magistrate judge reiterated that "[w]hile the location of [NCF-Berlin] has contributed to the dearth of volunteers available to perform religious services Bader could attend, it is the lack of volunteers, and not the transfer itself, that caused the substantial burden to Bader's religious practice." Id. at 48.

injunction.  This appeal followed.  The district court's denial of relief is effectively final, for its outcome turns on an issue of statutory interpretation that we review de novo.  United States v. Troy, 618 F.3d 27, 35 (1st Cir. 2010).  The issue is whether RLUIPA constrains prison transfers based on disadvantages at the transferee prison that are not themselves of the government's creation.

As a general rule and subject to the compelling interest and least restrictive means qualifications, RLUIPA protects prisoners whose religious exercise has been substantially burdened by an unintended or incidental effect of a religiously-neutral government action or rule of general application.  See Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009).  As we explained in Kuperman v. Wrenn, 645 F.3d 69, 79 (1st Cir. 2011), "RLUIPA provides greater protection to inmates' free-exercise rights than does the First Amendment."

Bader's problems at NCF-Berlin derive from a lack of outside clergy, volunteer visitors, and practicing co-religionists in the prison.  Bader does not charge that the government precludes visits from rabbis or volunteers or deliberately limits the number of Jewish prisoners; officials at NCF-Berlin appear to have done what they can to encourage visitors.  Nor does Bader point to any adverse rules or administrative practices within the prison itself

that are different from those at NHSP-Concord or unreasonably constrain Bader's religious practice.

Although local conditions and not prison restrictions are the immediate cause, Bader could answer that--working backward--his transfer was an anterior cause that contributed to placing him in this position. But that causal chain of events continues backward to the murder of his ex-wife, the actions of the state legislature in fixing sentences, and of the police, prosecutor, judge and jury entailed in Bader's prosecution, conviction and sentencing for that murder. See State v. Bader, 808 A.2d 12 (N.H. 2002), cert. denied, 538 U.S. 1014 (2003).

RLUIPA's language could be read to embrace any antecedent but-for, government-related event that bears on what happens to a prisoner after his confinement. For example, had Bader started his sentence at NCF-Berlin, he could argue that he is burdened by the failure of the state to transfer him to NHSP-Concord, or its failure to transfer other Jewish prisoners to NCF-Berlin and to hire a rabbi there. He could argue that the state's refusal to allow him parole after 10 years burdens his ability to practice his faith.

So despite RLUIPA's highly general language ("[n]o government shall impose a substantial burden . . .") and the admonition to read it broadly, 42 U.S.C. § 2000cc-3(g), it has to be glossed to provide some focus for determining just how far the

-8-

responsibility of the "government" extends.  Nothing in the mischiefs that led to its enactment suggests that it was meant to govern the siting of prisons, general policies of assigning prisoners or determining transfers, or the failure to assign prisoners by religion.

Rather, Congress' hearings on RLUIPA's predecessor enactments concerned meals meeting religious requirements; accommodations for fasting prisoners; and bans on devotional candles, religious texts or religious ornaments.  Cutter v. Wilkinson, 544 U.S. 709, 716 n.5 (2005) (citing Protecting Religious Freedom After Boerne v. Flores: Hearing before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 105th Cong. (1998)).  The focus of RLUIPA's sponsors was similarly on internal prison rules and procedures limiting religious practice.[4]

Almost all of the cases under the current statute involve problems of this conventional type.  Examples include:

> prohibitions on inmates preaching to fellow inmates, Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 35 (1st Cir. 2007);
>
> regulations on the length of facial hair, Kuperman, 645 F.3d at 71;

---

[4]Senators Hatch and Kennedy issued a joint statement shortly before RLUIPA's passage, which said that "prison officials sometimes impose frivolous or arbitrary rules" and also noted that "some institutions restrict religious liberty in egregious and unnecessary ways."  146 Cong. Rec. S7774-75 (daily ed. Jul. 27, 2000).

preclusion of inmates in administrative segregation from attending weekly prayer services, <u>Crawford</u> v. <u>Clarke</u>, 578 F.3d 39, 41 (1st Cir. 2009);

numerical limits on the possession of books, <u>Washington</u> v. <u>Klem</u>, 497 F.3d 272, 274 (3d Cir. 2007); and

policies regarding food service during a religious fast, <u>Lovelace</u> v. <u>Lee</u>, 472 F.3d 174, 181 (4th Cir. 2006).

In sum, we conclude that Bader's disadvantages in the Berlin prison depend importantly on proximate actions and decisions not attributable to the government and are too attenuated from the transfer decision to be considered government imposed burdens under RLUIPA. This would be a different case, and one governed by the First Amendment's Free Exercise Clause, if the Concord prison had transferred Bader for the <u>purpose</u> of restricting his religious opportunities or in retaliation for the exercise of his First Amendment rights. <u>Hannon</u> v. <u>Beard</u>, 645 F.3d 45, 47-49 (1st Cir. 2011), <u>cert. denied</u>, 132 S. Ct. 1105 (2012).

Our reading of RLUIPA is reinforced by the implications of Bader's claim. There are several <u>million</u> prisoners in the United States; many would likely prefer some other prison in the jurisdiction and many could plausibly claim that transfers would be more conducive to the practice of their religion. The prospect of litigation as to the comparative benefits and burdens of different prisons is immense. <u>Meachum</u> v. <u>Fano</u>, 427 U.S. 215, 225 (1976),

-10-

effectively cautioned the judiciary against becoming easily enmeshed in assignment and transfer decisions.

That Bader's transfer was legal under RLUIPA does not mean that it is wise or charitable to keep Bader indefinitely in Berlin, New Hampshire. Time has now passed since the incident occurred that concerned Major Fouts; and Bader's sincerity about his plight has not been disputed by the state. New Hampshire would do well to consider whether Bader can now be safely transferred back to the Concord prison and assigned to other tasks.

<u>Affirmed</u>.